# EXHIBIT 1

# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

-----------------------------------------------------------x

SHMUEL ELIMELECH BRAUN, *et al.*,

           Plaintiffs,

                                    Civ. No. 15-01136 (BAH)

     v.

THE ISLAMIC REPUBLIC OF IRAN, *et al.*,

           Defendants.

-----------------------------------------------------------x

## DECLARATION OF PATRICK L. CLAWSON

    I, Patrick L. Clawson, PhD, of the city of Washington in the District of Columbia, this 23rd day of May, 2016, declare pursuant to 28 U.S.C. § 1746 subject to penalties of perjury, as follows:

### A.    Professional Background

    1.    I am an expert on the Islamic Republic of Iran ("Iran") and have extensively studied and researched Iran and its sponsorship of terrorism, its economy, and its politics.  This affidavit is submitted to provide the Court with facts and evidence concerning Iran's funding of Hamas in the summer and fall of 2014.

    2.    I am the Director of Research at the Washington Institute for Near East Policy ("The Washington Institute"), where I have been employed since 1997. My previous positions include five years as senior research professor at the Institute for National Strategic Studies of the National Defense University and senior economist for four years each at the Foreign Policy Research Institute, the World Bank, and the International Monetary Fund.  Most of my

1

professional life has been spent studying the Middle East, in particular, Iran. My first scholarly article on the Middle East was published approximately thirty-five years ago, and my first work on the region for the Central Intelligence Agency was approximately twenty-five years ago.

3.      The Washington Institute is a think tank, in other words, a 501(c)(3) organization, which receives funding from a variety of individuals, all of whom are American, to conduct studies about U.S. foreign policy interests and concerns in the Middle East. As part of that work, the Washington Institute studies domestic and international issues relating to the Iranian government. My work includes extensive research regarding the Iranian Ministry of Intelligence and Security ("MOIS"), the Iranian Revolutionary Guard Corps (the "IRGC") and its Qods Division ("IRGC Qods") and the Iranian financial and banking system.

4.      As Director of Research at The Washington Institute, my duties include, *inter alia*, supervising a staff of about twenty senior researchers who study Middle East politics and terrorism, with considerable focus on Iran. Some of these researchers are well known for their expertise in the Middle East. For example, I have worked with Dennis Ross, President Clinton's Middle East Envoy and chief peace negotiator from 1993-2000 and President Obama's Special Assistant to the President and Senior Director of the Central Region (covering the Middle East) at the National Security Council from 2009-2013. I have also worked with former Deputy Assistant Secretary of the Treasury for Intelligence Matthew Levitt, responsible, *inter alia*, for following Iranian terror financing; and former Deputy Assistant Secretary of State, Scott Carpenter, who worked on Middle East reform programs. Under my supervision, the Washington Institute's researchers have written more than twenty studies about Iran's security apparatus, support for terrorism including terror financing, political leadership, and U.S. and Western policies to counter Iranian terrorism and terror financing. I also regularly brief and receive

briefings from senior United States military officials and senior officials of other governments friendly to the United States, about the threats from Iran, Iranian support of terrorism and Iranian strategy regarding terrorism.

5.      Over the last twenty-nine years, I have done contract consulting work on Iran for several U.S. government agencies, including the Central Intelligence Agency, the Defense Department, the State Department Bureau of Intelligence and Research, and through various contractors, the National Security Agency and the Defense Intelligence Agency.  While at the National Defense University, I worked closely with officials from a wide range of U.S. government agencies on the issue of Iran and Iranian support for terrorism, including close work with the Central Command (the U.S. military command responsible for the Middle East) and its subordinate commands, and with the staff of the Joint Chiefs of Staff.

6.      I have previously been designated and qualified by federal courts as an expert witness on issues relating to Iran, Iran's support for terrorism, its economy and other issues, and have given both live and written testimony in various cases brought against Iran for its sponsorship of terrorism, including *Cicippio v. Islamic Republic of Iran*, 18 F. Supp.2d 62, 68 (D. D.C. 1998); *Flatow v. Islamic Republic of Iran*, 999 F. Supp. 1, 8-9 (D.D.C. 1998); *Cronin v. Islamic Republic of Iran*, U.S.D.C., D.C. No. 99-02890 (1999); *Higgins v. Islamic Republic of Iran*, U.S.D.C., D.C. No. 99-00377 (1999); *Stehem v. Islamic Republic of Iran*, U.S.D.C., D.C. No. 00-00159 (2000); *Hegna v. Islamic Republic of Iran*, U.S.D.C., D.C. No. 00-00716 (2000); *Anderson v. Islamic Republic of Iran*, 90 F. Supp. 2d 107, 112-113 (D.D.C. 2000);  *Eisenfeld v. Islamic Republic of Iran*, 172 F. Supp. 2d 1, 5 (D.D.C. 2000); *Elahi v. Islamic Republic of Iran*, U.S.D.C., D.C. No. 99-02802 (1999); *Wagner v. Islamic Republic of Iran*, U.S.D.C., D.C. No. 00-017999; *Polhill v. Islamic Republic of Iran*, U.S.D.C., D.C. No. 00-01798 (2000); *Mousa v.*

3

*Islamic Republic of Iran*, 238 F. Supp. 2d 1, 3-4 (D.D.C. 2001); *Raffi v. Islamic Republic of Iran*, U.S.D.C., D.C. No. 01-850 (2001); *Kerr v. Islamic Republic of Iran*, U.S.D.C., D.C. No. 01-01994 (2001); *Surette v. Islamic Republic of Iran*, U.S.D.C., D.C. No. 01-00570 (2001); *Weinstein v. Islamic Republic of Iran*, 184 F. Supp. 2d 13, 19 (D.D.C. 2002); *Ungar v. Islamic Republic of Iran*, 271 F. Supp. 2d 91, 93 (D.D.C. 2002); *Stern v. Islamic Republic of Iran*, 271 F. Supp. 2d 286, 288 (D.D.C. 2003); *Rieger v. Islamic Republic of Iran*, 281 F. Supp. 2d 87, 90 (D.D.C. 2003); *Campuzano v. Islamic Republic of Iran*, 281 F. Supp. 2d 258, 262 (D.D.C. 2003); *Greenbaum v. Islamic Republic of Iran*, No. 02-2148, 2006 WL 2374221 at * 3 (D.D.C. Aug. 10, 2006); *Levin v. Islamic Republic of Iran*, U.S.D.C., D.C. No. 05-2494 (2007); *Owens v. Republic of Sudan*, et al., No. 01-2244, 2011 U.S. Dist. LEXIS 135961 (D.D.C. Nov. 28, 2011); *In Re Terrorist Attacks on September 11, 2001*, No. 03-MDL-1570 (S.D.N.Y. Dec. 22, 2011), among others.

7.    I have also testified before the House International Relations, National Security, and Banking and Financial Services Committees and the Senate Foreign Relations and Banking Committees about Iran, Iranian terrorism, and the use of economic measures to discourage Iran from supporting terrorism.

8.    I have made presentations about the foreign and economic policy of Iran, including its support for terrorism, and about U.S. policy towards Iran at conferences sponsored by, amongst other organizations, the Iranian Foreign Ministry's Institute for Political and International Studies in Tehran, Iran, the Royal Institute for International Affairs in London, UK, the Royal United Services Institute in London, UK, the Japanese Foreign Ministry in Tokyo, Japan, the Institute for Defense Studies and Analysis in New Delhi, India, the Shanghai Institute for International Studies in Shanghai, China, the Jaffee Center of Tel Aviv University in Tel

Aviv, Israel, the Council for Foreign Relations in New York City, New York, the Nixon Center (part of the Nixon Presidential Library) and the Carnegie Endowment for International Peace in Washington, D.C., and a great many universities. I have given presentations concerning Iran at more than 200 symposiums in more than twenty countries.

9.      My books and monographs include: *How Iranians Might React to a Nuclear Deal* (The Washington Institute, 2014, with Mehdi Khalaji), *An Iranian Nuclear Outbreak is Not Inevitable* (The Washington Institute, 2011), *The Red Line: How to Assess Progress in U.S. Iran Policy* (The Washington Institute. 2010); *The Perfect Handshake with Iran: Prudent Military Strategy and Pragmatic Policy* (The Washington Institute, 2010); *Much Traction from Measured Steps: The Iranian Opposition, the Nuclear Issue, and the West* (The Washington Institute, 2010); *Engaging Iran: Lessons from the Past* (The Washington Institute for Near East Policy, 2009, edited); *The Last Resort: Consequences of Preventative Military Action Against Iran* (The Washington Institute, 2008, with Michael Eisenstadt); *Eternal Iran: Continuity and Chaos* (Palgrave Press, 2005, with Michael Rubin); *Getting Ready for a Nuclear-Ready Iran* (U.S. Army War College, 2005, with Henry Sokolski, edited); *Checking Iran's Nuclear Ambitions* (U.S. Army War College, 2004, with Henry Sokolski, edited); *Iran Under Khatami* (The Washington Institute for Near East Policy, 1998, with others); *Strategic Assessment*, (the flagship annual report of the Institute for National Strategic Studies of the National Defense University, which I inaugurated and edited for three years, 1995-1997); *U.S. Sanctions on Iran* (Emirates Centre for Strategic Studies and Research, 1997); *Business as Usual? Western Policy Options Towards Iran* (American Jewish Committee 1995); *Energy Security in the Twenty-First Century* (National Defense University Press, 1995, edited) ; *Iran's Strategic Intentions and Capabilities* (National Defense University Press, 1994, edited); and *Iran's Challenge to the*

*West: How, When, and Why* (the Washington Institute for Near East Policy, 1993). The book I co-authored with Rudi Matthee and Willem Floor, *The Monetary History of Iran: From the Safavids to the Qajars*, was awarded the Houshang Pourshariati Iranian Studies Book Award for the best book about Iran in 2014 from the Middle East Studies Association, the organization of U.S. scholars studying the Middle East.

10. In addition, I have written about the contemporary Middle East, including about Iran, for a variety of news publications, including The New Republic, The New York Times, Wall Street Journal and Washington Post. I have also authored more than forty scholarly articles for academic publications, such as Foreign Affairs, Survival, Washington Quarterly, International Journal of Middle East Studies, Middle East Journal, Les Cahiers de l'Orient and Oxford Bulletin of Economics and Statistics.

11. From 1995 to 2012, I was senior editor of Middle East Quarterly, a journal of Middle Eastern affairs, which regularly publishes on Iranian politics and Iran's foreign policy. From 1990 through 1994, I was editor of Orbis, a foreign policy journal.

12. I hold a Ph.D. in economics from the New School for Social Research and a B.A. from Oberlin College.

13. I am able to read and/or speak Persian and French as well as some Hebrew, Spanish, and German. I read the Iranian press regularly through the internet. I also read other publications from Iran, including books in Persian.

14. A copy of my CV is attached hereto as Exhibit A

**B.     Nature of This Expert Witness Report**

15. I have been asked by counsel for plaintiffs in the case of *Braun, et al. v. The Islamic Republic of Iran, et al.* to provide my professional opinion as to whether Iran financed

and supported Hamas in the 2014 time period. I have reviewed the complaint filed by the Fraenkel plaintiffs.

16.     My knowledge of Iran's sponsorship of terrorism comes as a result of my routine and in-depth access to facts concerning Iran, its support of terrorism, its economy and politics and my extensive study of Iran as outlined herein, including my professional research and publishing in this field over the course of many years. Indeed, as part of my work, I spend at least one hour a day reviewing writings, including online sources, relating to Iran and other nations that sponsor terrorism.  Iran is a relatively open information country in which the competing political forces frequently reveal information about the country's security apparatus and debate issues relating to terrorism.  Iran even has many internet sites that publish information on these subjects.  From my years studying Iranian politics and given the competing sources that can be compared, I believe that I am able to determine whether Iranian reports on these subjects are credible.  Indeed, I use this information as a source to brief the United States and other governments.  Furthermore, Iran and some of the terrorist groups it sponsors have been openly boastful about their relations, and have described and detailed their connections in print.

17.     My opinions set forth below are based upon my education, research, and experience as well as my review and analysis of documents and sources typically relied upon by experts in my field.  Such documents and sources include, but are not limited to: official speeches made by Iranian officials, U.S. officials, and the officials of other countries, my conversations with U.S. officials, former Iranian officials, and officials of other countries; and my review and analysis of relevant documents, including newspaper accounts (in both the English-language press and Persian language press).

## C.     The Iranian Regime

18.     In 1979, the Islamic Republic of Iran came to power both through a popular revolution and then through a series of referenda.   This government replaced the previous regime, which was headed by Shah Mohammad Reza Pahlavi. From the beginning, the Islamic Republic of Iran's political and religious institutions were overseen by a single person, a religious leader who is called "the Supreme Leader." The Iranian Constitution provides that the Supreme Leader has the authority to dismiss the Iranian President, overrule the parliament and the courts, and overrule any secular law.   In addition, the Supreme Leader is imbued by the religious community with the authority to overrule any religious law if necessary for the "expediency of the system."   Indeed, under the Constitution, the Supreme Leader appoints an Expediency Council to advise and assist him in overriding any law, civil or religious, which is found inexpedient.

19.     At the time of the 1979 revolution, Ayatollah Ruhollah Khomeinei was the Supreme Leader. Currently, the Supreme Leader is Ayatollah Ali Khamenei.  He is the only person, other than Ayatollah Khomeinei, ever to hold the title of Supreme Leader. The Supreme Leader is not popularly elected.  He is chosen by an "Assembly of Experts," the members of which, in theory, are popularly elected.  In fact, however, all candidates for the Assembly of Experts must be approved by the previous Supreme Leader. That makes the selection of the Supreme Leader rather like the election of a Pope by the College of Cardinals.

20.     The Islamic Republic of Iran's political structure is bifurcated into two aspects: a formal governmental structure and a revolutionary structure.  The Supreme Leader oversees both aspects.  Iran's President is subordinate to the Supreme Leader, but otherwise leads Iran's formal governmental structure.  The Supreme Leader oversees the revolutionary structure, which

includes entities, some of which are described herein, that are parallel to the traditional government agencies within the formal government structure. For example, the Iranian Revolutionary Guard Corps (IRGC) is parallel to the regular military of Iran. There are revolutionary courts that are parallel to the regular courts of Iran. However, in each case, the revolutionary institution is the more powerful of the pair.

**D.      The Iranian Ministry of Intelligence and Security (MOIS)**

21.      MOIS, Iran's foreign and domestic intelligence service, is one of the principal organizations Iran has used to carry out its terrorist support activities. MOIS is the successor agency to the respected spy agency called SAVAK, run by the Shah. After the 1979 revolution, that organization was not disbanded, but maintained in a secret manner, and then formed as a ministry openly (MOIS) several years after the 1979 revolution. MOIS at one point had approximately 30,000 employees, making it the largest intelligence agency in the Middle East, and was considered in effectiveness second only to Israeli intelligence. Credible reports estimated its annual budget in the late 1990s to have been approximately between $100 and $400 million dollars.

22.      These conclusions are based on: (1) the findings in the German so-called Mykonos criminal court case (named for a murder which took place at a restaurant in Berlin called the Mykonos), which involved murders carried out in Berlin and organized by MOIS at the instructions of senior Iranian government officials, and included testimony from a defector who had been a top official in MOIS; and (2) the information which emerged in Iran in 1999/2000, largely as leaks from an official government investigation about activities of MOIS and other parts of the Iranian intelligence apparatus in reaction to assassinations of dissidents in Iran. During the course of that investigation, Iran's president (Mohammed Khatami) complained

he had no control over MOIS, with the Minister being appointed at the direction of the Supreme Leader.

23.     For some years, MOIS's role appears to have been downgraded as the IRGC took over more and more functions. Indeed, since the disputed presidential election in 2009 led to a considerable expansion in the IRGC's intelligence arm, that organization appeared to be eclipsing MOIS's role.  However, after some serious operational missteps by the IRGC and IRGC/Qods in 2011-2012 – including getting caught red-handed at botched terror attacks in the United States (the planned attack on the Saudi Ambassador to the United States to which Mansour Arbabsiar pleaded guilty in federal court), India, Azerbaijan, Bulgaria, Cyprus, and Malaysia, among other places – MOIS appears to have made something of a comeback.

24.     U.S. Department of State reports have frequently referred to Iranian intelligence services role in facilitating terrorist attacks, at a time when the only Iranian intelligence service of any size was MOIS.  In "Patterns of Global Terrorism 1990," the State Department wrote that, "Iran has used its intelligence services extensively to facilitate and conduct terrorist attacks . . . . Intelligence officers have used the diplomatic pouch for conveyance of weapons and finances for terrorist groups."   United States Department of State, Office of the Coordinator for Counterterrorism, Patterns of Global Terrorism 1990, (Apr. 29, 1991).

25.     In providing support to Hamas and other terrorist groups, MOIS is acting as a ministry of the Iranian government whose activities are tightly and carefully controlled by the Iranian government through the Supreme Leader and his representatives. In sum, the terrorism training provided to Hamas and other terrorist groups by MOIS is an official policy of the Iranian government.

E.     **Iran's Use of Ostensibly Charitable Foundations as Fronts to Conceal its Activities**

26.     As part of its revolutionary system parallel to ordinary state institutions, Iran has a number of large "foundations" which control extensive assets.  In 2013, Judge Forrest of the U.S. District Court for the Southern District of New York found in *In re 650 Fifth Avenue and Related Properties (Alavi-Assa)*[1] that the Alavi Foundation of New York was controlled by one of these foundations in Iran which in turn was under the control of the Iranian government; that was the basis for seizing the Alavi Foundation of New York's assets, including the office building at 650 Fifth Avenue reported by the New York Times to be worth about $800 million.

27.     Another such Iranian foundation is the Martyr's Foundation to use its original name; it has gone through several name changes and mergers, with the current name being the Martyrs and Self-Sacrificers (*i.e.*, war-wounded) Foundation. The director of this Foundation is appointed by the Supreme Leader, and the organization appears to be largely funded by direct grant from the Iranian government (I am not aware of any financial statement available). In his book, *The Pasdaran: Inside Iran's Islamic Revolutionary Guard Corps*, noted scholar of Iran's IRGC Emanuele Ottolenghi describes the Martyrs Foundation as being controlled by the IRGC: "The IRGC indirectly controls two economic conglomerates that are unique to Iran's revolutionary structures: the Foundation of the Oppressed of the Earth (Bonyad-e Mostazafan) and the Foundation of Martyrs and Veterans' Affairs (Bonyad-e Shahid va-Omur-e-Janbazan) [its name at the time of this 2011 book]... The Foundation for Martyrs' and Veteran Affairs [is] currently headed by former IRGC Air Force commander Hossein Dehghan. The Foundation acts as a mortgage lender to Basijis' and martyrs' families, and as an influential stakeholder in Iran's economy."

---

[1] 2013 WL 5178677 (S.D.N.Y. Sept. 16, 2013)

28.    Reports appear in the Iranian press about senior officials from the Martyr's Foundation visiting Lebanon, with the implication being that the Foundation continues to be active there. The organization's website contains many statements of praise for Palestinian terrorist "martyrs" but is silent about the Martyr's Foundation's activities regarding Palestinians. It is noteworthy that Palestinian organizations including Hamas have long spoken about the support they provide to the families of those killed or imprisoned by Israel, both directly from government funds and indirectly through organizations like the Al Nur Prisoner's Society in Gaza, a Hamas charitable organization similar to the Iranian Martyr's Foundation.

29.    The lack of detail from the Martyr's Foundation about its activities abroad is presumably related to the actions that the U.S. government has taken against the Martyr's Foundation for its support for terrorists, including Hamas terrorists. On July 24, 2007, the Treasury Department designated the Iranian Martyr's Foundation under Executive Order 13224, which is aimed at financially isolating terrorists and their support networks. The Treasury press release explained:

> The Martyrs Foundation is an Iranian parastatal organization that channels financial support from Iran to several terrorist organizations in the Levant, including Hizballah, Hamas, and the Palestinian Islamic Jihad (PIJ). To this end, the Martyrs Foundation established branches in Lebanon staffed by leaders and members of these same terrorist groups. Martyrs Foundation branches in Lebanon has also provided financial support to the families of killed or imprisoned Hizballah and PIJ members, including suicide bombers in the Palestinian territories. In addition to fundraising responsibilities, senior Martyrs Foundation officials were directly involved in Hizballah operations against Israel during the July-August 2006 conflict. In addition, a Lebanon-based leader of the Martyrs Foundation has directed and financed terrorist cells in the Gaza Strip that worked with Hizballah and PIJ.[2]

---

[2] See *Twin Treasury Actions Take Aim at Hizballah's Support Network*, 7/24/07, available at https://www.treasury.gov/press-center/press-releases/Pages/hp503.aspx.

30.   In sum, Iran provides state support to terrorism through ostensibly charitable organizations, including support to Hamas through Iran's Martyr's Foundation.

**F.     U.S. State Department Judgments about Iran's Support for Terrorism**

31.   Iran is now, and since 1985, has been continuously listed on the U.S. State Department list of state sponsors of terrorism. The Secretary of State is required under U.S. law to provide Congress with an annual full and complete report on terrorism with regard to those countries and groups meeting criteria set forth in Title 22 of the United States Code, Section 2656 f(a) (requiring the Department of State to provide Congress with a full and complete annual report on terrorism for those countries and groups meeting the criteria of Sections (a)(1) and (2) of the Act).   The list is set forth in an annual report called *"Patterns of Global Terrorism"* or more recently *"Country Reports on Terrorism"* (referred to herein as "Patterns of Global Terrorism").   Patterns of Global Terrorism is highly respected by researchers on terrorism, since the State Department has access to reliable intelligence sources not available to the general public and puts considerable effort into the document, making sure to double check and verify all facts and weighing each word carefully.   Patterns of Global Terrorism reports frequently refer to Iran's role as a sponsor of terrorism and to its support for Hamas.   Below are quotes from Patterns of Global Terrorism for selected years (the reports for intervening years have very similar statements to those cited here):

- **1994** - "Iran supports many other radical organizations that have engaged in terrorism. Tehran opposes any compromise with or recognition of Israel and, as the peace process moves ahead, has worked to coordinate a rejectionist front to oppose the Israeli-PLO accords, particularly with the PIJ [Palestinian Islamic Jihad], the PFLP-GC, and Hamas, as well as Hizballah."
- **1999** - "In Iran in 1999 [and every year before since 1983], the actions of certain state institutions in support of terrorist groups made Iran the most active state sponsor of terrorism.   These state institutions notably the Revolutionary Guard Corps and the

13

Ministry of Intelligence and Security, continued to be involved in the planning and execution of terrorist acts and continued to support a variety of groups that use terrorism to pursue their goals.

"Iran has long provided Lebanese Hizbollah and the Palestinian rejectionist groups – notably Hamas, The Palestine Islamic Jihad, and Ahmad Jibril's PFLP – GC with varying amounts of funding, safe haven, training and weapons. . . . Iran continued to encourage Hizbollah and the Palestinian groups to coordinate their planning and to escalate their activities against Israel."

- **2003** - "Iran remained the most active state sponsor of terrorism in 2003. Its Islamic Revolutionary Guard Corps and Ministry of Intelligence and Security were involved in the planning of and support for terrorist acts and continued to exhort a variety of groups that use terrorism to pursue their goals.

"During 2003, Iran maintained a high-profile role in encouraging anti-Israeli activity, both rhetorically and operationally. Supreme Leader Khamenei praised Palestinian resistance operations, and President Khatami reiterated Iran's support for the "wronged people of Palestine" and their struggles. Matching this rhetoric with action, Iran provided Lebanese Hizballah and Palestinian rejectionist groups—notably HAMAS, the Palestine Islamic Jihad, and the Popular Front for the Liberation of Palestine–General Command—with funding, safe haven, training, and weapons. Iran hosted a conference in August 2003 on the Palestinian intifadah, at which an Iranian official suggested that the continued success of the Palestinian resistance depended on suicide operations.

- **2014** - "Designated as a State Sponsor of Terrorism in 1984, Iran continued its terrorist-related activity in 2014, including support for Palestinian terrorist groups in Gaza....The IRGC-QF [Quds Force] is the regime's primary mechanism for cultivating and supporting terrorists abroad.... Iran has historically provided weapons, training, and funding to Hamas and other Palestinian terrorist groups, including Palestine Islamic Jihad (PIJ) and the Popular Front for the Liberation of Palestine-General Command (PFLP-GC). These Palestinian terrorist groups have been behind a number of deaths from attacks originating in Gaza and the West Bank. Although Hamas's ties to Tehran have been strained due to the Syrian civil war, in a November 25 speech, Supreme Leader Khamenei highlighted Iran's military support to 'Palestinian brothers' in Gaza and called for the West Bank to be similarly armed. In December, Hamas Deputy Leader Moussa Abu Marzouk announced bilateral relations with Iran and Hamas were 'back on track.'"

14

**G.    Iran's Relationship With Hamas in Context of Its Support for Terrorism**

32.    It has been well-documented for over thirty years that Iran has provided funding and training for terrorism operations that targeted United States and Israeli citizens.

33.    Such activities have included support for Hizbollah of Lebanon, al-Qaeda and Hamas, with the character of that support being quite different in each case.    Hizbollah of Lebanon (or Hizbollah for short, though not to be confused with similarly named organizations in other countries which have varying degrees of ties with Hizbollah of Lebanon) is a Shiite terrorist organization established in 1982 by Iran as an extension of the Iranian Revolution in Lebanon and elsewhere in the Middle East.    The IRGC's relationship with Hizbollah is extremely close, as is frequently proclaimed by leaders of Hizbollah and of Iran.    Leaders on both sides refer to Iran's extensive financial and military support to Hizbollah.

34.    Hamas is a terrorist organization established in 1987 by Palestinian Sunni Islamist militants opposing the establishment and existence of Israel. The founders of Hamas were close to and are ideologically aligned with the Egyptian Muslim Brotherhood organization.    It is sometimes said that Hamas emerged out of the Gaza affiliate of that Muslim Brotherhood organization.    The organizing principle of Hamas was advocacy of terrorist attacks on Israeli civilians, which its members did not think that the predominant Palestinian organization (the Fatah movement long led by Yassir Arafat) was doing sufficiently.

35.    While Iran's relationship with Hamas has waxed and waned over the years, Iran never cut off all its support for Hamas even during periods when the relation was cool, and when the relationship was warm, Iran provided substantial financial and military support.

36.    From about 1993 until the late 1990s, Iran and Hamas became very close, as a result of Hamas' willingness to perform terrorist activities and bus bombings. Iran had an urgent

desire to disrupt the Middle East peace process, which appeared to be moving forward at the time and Iran considered terrorist activities as a way to disrupt the peace process. Iran was strongly and publicly encouraging Hamas to carry out such activities. Throughout this period, Hamas operatives received military training in Iran. During an interview in 1997 with CBS' 60 Minutes TV program, Hassan Salameh, the designer of the February 25, 1996 bombing of the Number 18 Egged Bus in Jerusalem, confessed to planning the bombing, getting trained in Iran and receiving other support from Iran.

37.    In March 1996 at a summit held in Egypt, I am personally aware that then Israeli Prime Minister, Shimon Peres, identified Iran as the principal sponsor of Hamas terrorism, and Palestinian Authority Chairman, Yasser Arafat, went so far as to state that Iran "ordered" bus bombings in Israel, including the one on February 25, 1996.  My knowledge is based on briefings by Israeli officials at the highest level of government close to Mr. Peres, and by U.S. high level officials with personal knowledge of these activities.

38.    Moreover, especially in 1995-1997, rarely did a Friday prayer meeting go by without the person leading prayers in Tehran, Iran praising bombings such as the subject bus bombing, with those statements then being widely carried on Iranian state-owned television, radio, print media and Iran's other propaganda networks throughout the Arab world.  After the frequent bombings in the winter of 1995-1996, the Iranian news agency ran extremely inflammatory statements calling for further bombings and more blood.

39.    During this period from about 1993 until the late 1990s, Iran gave Hamas millions of dollars, in addition to the hundreds of millions of additional dollars that Iran spent supporting other terrorist groups. The money, among other things, supported Hamas' terrorist activities, *e.g.*, by bringing Hamas into contact with potential terrorist recruits and by providing legitimate front

activities behind which Hamas could hide its terrorist activities. Iran typically paid generously for "results," and Hamas was providing "results" by committing numerous bombings during this time.

40.     After a period when the Iran-Hams relationship cooled, it deepened again in 2002. In *Hamas: The Islamic Resistance Movement* (Cambridge: Polity Press, 2010), by British professor Beverley Milton-Edwards and *New York Times* correspondent Stephen Farrell, the authors cite on p. 93 a November 2002 interview with "one of [Israeli Prime Minister Ariel] Sharon's most senior intelligence chiefs" who said, "[Hamas] kept its independence since being established in 1987, but during the last year we could see how it has been changed, and Hamas became more dependent on Iran. The leadership of Hamas sits in Damascus, and they travel every three or four weeks to Iran." In a July 30, 2003 report entitled "The Financial Sources of the Hamas Terror Organization," the Israeli Ministry of Foreign Affairs estimated that Iran provided Hamas with $3 million a year.

41.     With a fall-off in Hamas terrorist activities – largely due to a fierce Israeli campaign against the organization – the Iran-Hamas relationship cooled after 2003. It warmed again after Hamas did well in the 2006 Palestinian elections and especially after the 2007 coup by which Hamas took complete control of the Gaza Strip, with Iran providing more money and arms. On March 5, 2007, Yuval Diskin, the director of Israel's Security Agency (often referred by as Shin Bet, for its initials in Hebrew), told a press briefing as quoted in Milton-Edwards and Farrell, p 132, "What we see that is more dangerous than any weapons is the training that Iran has promised Hamas. We know that Hamas has started to dispatch people to Iran, tens with the promise of hundreds, for months and maybe years of training." Milton-Edwards and Farrell also cite several interviews with Hamas fighters who acknowledged to them that Iran was providing

17

Hamas with weapons. They also write on p. 225, "Hamas leaders openly acknowledged during this immediate post-election period [referring to the 2006 Palestinian elections] that they were getting financial help from Iran and others."

42.    The Iran-Hamas relationship waned again after 2011 as the IRGC provided arms and fighters to support the Assad regime in Syria in its battle against insurgents who included Sunni Islamists, but then the relationship improved after the Egyptian military's 2013 overthrow of the Morsi government which had been close to Hamas, leaving Hamas quite dependent on Iranian aid. In January 2014, Taher al-Nounou, an aide to Gaza's Prime Minister Ismail Haniyeh (one of the most important Hamas leaders), said "Relations between us [Iran and Hamas] are now almost back to how they were before. We believe we shall soon be back at that point." Asked if Iran had resumed its financial support, Nounou said, "We don't announce these things because there would be efforts to stop it."[3] Bassam Naim, another senior Hamas official added "Ties [between Hamas and Tehran] had never been conclusively severed, but recently there have been a number of meetings that brought new blood back into our relationship with Iran"[4]

43.    In March 2014, Israel intercepted the Panamian-flagged *Klos C* ship in the Red Sea off the Sudan coast, finding on board 40 M-302 advanced surface-to-surface rockets, 181 mortar shells, and 400,000 rounds of 7.62mm caliber ammunition. A leaked report from the UN's Sanctions Committee charged with monitoring UN Security Council Resolution 1747's order banning Iran from exporting weapons found that the origin of the shipment was in Iran,

---

[3] *See* Sherwood, Harriet, *Hamas and Iran Rebuild Ties Three Years After Falling Over Syria*, 1/9/14, *The Guardian*, available at  http://www.theguardian.com/world/2014/jan/09/hamas-iran-rebuild-ties-falling-out-syria.
    [4] *Id.*

18

based on the ship's manifest, statements by the captain, and the nature of the cargo.[5] (That committee did not discuss to where the arms were headed (that not being in their mandate), but Israeli officials provided details of the plans to smuggle the arms from Sudan across Egypt into Hamas-controlled Gaza. The State Department's Country Report on Terrorism 2014 describes the episode as, "In March 2014, Israel intercepted a weapons shipment containing rockets, mortars, and ammunition destined for Hamas and PIJ [a small pro-Iranian group in Gaza] in Gaza"[6] In sum, there is strong reason to think that this arms shipment was organized by Iran.

44.     Hamas-Iran relations were further strengthened in the course of 2014 as Hamas stepped up its terror activities.  After Hamas's June 12 kidnap and murder of three teenagers including Naftali Fraenkel, Hamas rocket attacks and Israeli air strikes escalated into an Israeli invasion of Gaza on July 8 which continued until August 26, with the deaths of 71 Israelis and over 2,000 Gazans.  Iran issued statements strongly supporting Hamas' activities during this time and in the aftermath.  On September 29, Major General Ghola Ali Rashid of the Iranian Armed Forces General Staff Headquarters said, "Today some of our commanders are providing advisory assistance to Iraq and its army, in addition to the resistance in Lebanon, Hezbollah, and the Palestinian resistance movement." Supreme Leader Khamenei said on November 25, "The Islamic Republic of Iran, with divine grace, has not become prisoner of sectarian limitations and divisions.  Just as it aids Shi'a Hizbollah in Lebanon, it aids Hamas and Islamic Jihad [PIJ] and other Sunni groups in Palestine."[7]

---

[5] *Iran's Hand in Gaza: A Little-noticed U.N. Report Discloses the Tehran Regime's Role in Fueling Middle East Terror*, 7/8/14, *The Wall Street Journal,* available at http://www.wsj.com/articles/how-iran-fuels-terror-1404849442.

[6] *Country Reports on Terrorism 2014*, U.S. Department of State, available at http://www.state.gov/j/ct/rls/crt/2014/239413.htm.

[7] Author's translation from the statement on Khamenei's website http://farsi.khamenei.ir/news-content?id=28249.

45. A Hamas high-level delegation visited Tehran on December 8, 2014 just ahead of the annual December 14 celebration of the organization's founding in Gaza. To quote the respected on-line news service Al-Monitor, "A senior Hamas official abroad, who spoke on condition of anonymity, told Al-Monitor, 'Hamas is aware that Iran is under a harsh economic blockade and its financial expenses are enormous in neighboring countries. We may not have great hopes that financial support will be generous as it was before, but the military support for the movement may not be harmed much, which is sufficient for us at this stage."[8]   On December 9, 2014, Mohammad Nasr, part of the Hamas delegation in Tehran, said, "The Islamic resistance in Gaza [i.e., Hamas] defeated the Zionists because of the Islamic Republic's support." On December 14, Abu Obeida, the spokesman for Hamas' military wing called the Izz ad-Din al-Qassam Brigades, expressed his thanks to Iran for supporting Hamas with money and weapons and providing it with rockets and anti-tank missiles.[9] That was an unusually blunt comment.  Hamas' usual policy, as expressed by Hamas representative in Tehran, Khalid al-Qaddumi, is "Hamas does not have to reveal the mechanism and details of the support it receives from any party."

## H.    Financial Deterrence of Iranian Material Support to Terrorists

46.    Iranian leaders pay close attention to civil suits about terrorism. In 2000/01, the issue became a major controversy in Iran. Iran's permanent representative to the UN, Nejad Hosseinian, went on Iranian television to complain about the suits and to answer criticisms that the Iranian government had not succeeded at stopping them. Representative Golbaz, a member of the Iranian Parliament's National Security and Foreign Policy Commission, complained, "Those American courts that make such rulings do so in the absence of the defendant as there is no Iranian representative in attendance in these courts." Former Iranian President, now chairman of

---

[8] Adnan Abu Amer, *Hamas asks Iran for money, weapons*, *Al-Monitor*, December 17, 2014.

20

the powerful Expediency Council (charged with resolving disputes among the various organs of government), Ali Akbar Hashemi Rafsanjani complained at length about the suits, as did numerous members of Iran's Parliament. They were particularly upset at the large punitive damage awards, which they acknowledged exceeded a billion dollars. In late 2000, the Iranian Parliament adopted a law permitting Iranians to file suit against the U.S. government for its alleged misdeeds, such as the 1953 overthrow of Iranian Prime Minister Mussadegh (the law permits suits when damage is sustained from any action by a foreign government in contravention of international law, including interference in Iran's domestic affairs, or when damage is incurred from acts of terrorist groups backed by foreign governments). The Iranian government has several times referred to such a lawsuit having been brought, although the situation is not entirely clear.

47.     Around the same time, Iran's lawyers expressed outrage at the suits. At the American Iranian Council's July 2000 forum on the grounds of the U.S. Capitol entitled "U.S.-Iran Relations: Financial Impediments and the Challenges of a 'Global Settlement,' Mohammad Hossein Zahedin Labbaf, Iran's chief representative before the Iran-U.S. Claims Tribunal in the Hague[10], devoted his remarks to a tirade against the American court suits regarding Iranian support for terrorism brought under the FSIA amendments. This was surprising to the American participants, who had assumed that the chief financial impediments to improving U.S.-Iranian relations related to the U.S. sanctions on Iran or the continuing disagreements at the Hague Tribunal about what Iran describes as "frozen assets." As an example of Labbaf's rhetoric, he said of these court suits, "They are detrimental to universal legal order, to the cause of justice, to

---

[9] *Id.*

[10] This claims tribunal was established to adjudicate claims under the 1981 Algiers Accord freeing the U.S. embassy hostages.

the United States' international image, and finally, to the long-term interests of both countries."
He also described them as contrary to article 11(4) of the 1955 Treaty of Amity between the
United States and Iran, regarding sovereign immunity.

48.     Despite the clear indications that in 2000 Iranian leaders were paying close
attention to the court judgments against Iran for its support of terrorism, the effort to dissuade
Iran from providing financial support for terrorism against Americans did not succeed.  Several
significant obstacles got in the way:

- The continuing influence of the most extreme elements in Iran, who have repeatedly
  rebounded from setbacks such as the election of two presidents who successfully
  opposed hardliners (Mohammed Khatami, elected in 1997 and re-elected in 2001, and
  Hassan Rouhani, elected in 2013).

- Iran's confidence that its oil income will be sufficient to finance its domestic needs
  and the support of terrorism, which is quite modest compared to the tens of billions in
  oil revenue.  While this confidence was dented by the tough sanctions against Iranian
  oil sales adopted in 2012 by the European Union and the U.S. government, Iranian
  leaders soon spoke with great assurance that by successful negotiations over the
  nuclear impasse, they could get these sanctions reversed and regain full access to tens
  of billions of dollars – by some accounts, more than $100 billion -- in foreign
  exchange reserves to which Iran has had limited access.

- The perceived successes of major terrorist groups which receives direct and material
  financial support from Iran, namely, Hezbollah's performance in its 2006
  confrontation with Israel, followed up by its 2009-10 success in keeping a role in the
  Lebanese government despite doing badly in the elections, and Hamas' 2007 takeover
  of Gaza, though that has been tarnished by its poor showing in subsequent
  confrontations with Israel.

- The perception that the United States was tied down by Iraqi and Afghan insurgents
  who deliberately targeted innocent civilians, which Iranian leaders have often
  proclaimed as evidence that Islamist resistance movements and their terrorist
  activities can defeat the United States.

49.     In consideration of these factors, the financial pressure to abandon terrorism
against U.S. citizens and entities as a result of past court judgments was not sufficiently

powerful as to induce Iran to change course. But that pressure, in my opinion, certainly remains, and should not be underestimated, as an element in Iran's calculations about whether and how to support terrorism.

50.     Indeed, Iran has recently been taking a more active stance about court actions regarding its support for terrorism. After years in which no lawyers representing Iran showed up to contest such actions, Iran has engaged lawyers in several recent suits. The most prominent case is *Peterson v. Islamic Republic of Iran*, U.S. District Court, Southern District of New York, No. 13-9195, a 2010 lawsuit seeking the seizure of $1.75 billion dollars held by Citibank of funds belonging to Bank Markazi, the Iranian central bank, to partially satisfy a $2.65 billion 2007 judgement against Iran in favor of relatives of American troops killed in the 1983 Marine Corps barracks bombing in Lebanon. Bank Markazi vigorously contest the suit, with an appeal all the way up to the U.S. Supreme Court, which was recently rejected.

51.     Prior to that case, the most active Iranian role was a claim against property held at the University of Chicago Oriental Institute. After it was filed in May 2004, the claim was ignored by Iran until the June 2009 ruling by U.S. District Judge Blanche M. Manning that the case could proceed. Iran's lawyers then intervened for the first time.  This came after the Iranian government had been for several years conducting an extensive and prolonged propaganda campaign to denounce the court decisions about the sale of ancient Iranian tablets held by the Oriental Institute in order to make partial payment of some outstanding claims from such suits. The propaganda has played on Iranian national pride in the country's rich historical heritage, arguing that the terrorism damage suits endanger these valuable items from Iran's cultural heritage.

52.     Another example of a more active Iranian stance was a Montreal, Quebec suit seeking damages for the death under torture of a Canadian-Iranian, *Estate of the late Zahra (Ziba) Kazemi, and Stephan (Salman) Hashemi v. the Islamic Republic of Iran, et al.*, Montreal Superior Court case No. 500-17-031760-062, which Iran's lawyers vigorously contested after it was filed in December 2009.

53.     Considering the factors inherent in awarding punitive damages, that of punishment and deterrence, it is noted that, in the wake of these lawsuits, Iran has not decreased its support for terrorism, but has dramatically increased and widened its support for terrorists, terrorist organizations and terrorist activities throughout the world.   Punishment can be measured, in large part, in assessing significant financial damages for the continued and expanded wide-ranging world-wide support for terrorism supported by the Islamic Republic of Iran and its governmental arms.   Iran is blatant in its support of terrorism.   As to deterrence, there are two factors to consider:   deterring such conduct by others, and making further efforts to deter Iran in its bold and increasing support for terrorism, which Iran uses to expand its influence, its reach and its force by terrorist means.

54.     In my expert opinion, Iranian officials pay extremely close attention to what the outside world has to say about the Iranian government and its policies, and they generally assume that whatever is written about Iran – whether by judges, by independent newspapers, by non-governmental organizations, or by foreign ministries – is the direct product of a unified policy by the government of the country from which the comment originates.   Furthermore, as noted earlier, they have shown themselves to be sensitive to the punitive damages levied against Iran, and they are well aware that such damages have been a common feature in actions against Iran for its support of terrorism against Americans.   Were this Court not to impose punitive

24

damages for what was a spectacular terrorist act, this would be read by Iranian government officials as indicating a significant weakening of U.S. pressure on Iran to end its support for terrorism against Americans.  On the other hand, were this Court to impose substantial punitive damages, this would be read by Iranian officials as indicating that U.S. policy remains firmly opposed to Iranian support for terrorism against Americans.


I DECLARE UNDER PENALTY OF PERJURY UNDER THE LAWS OF THE UNITED STATES OF AMERICA THAT THE FOREGOING IS TRUE AND CORRECT.

--/-------------------------------------                    May 23, 2016

Patrick Clawson, PhD.                                          Date

**Exhibit A**

**Curriculum Vita of Patrick L. Clawson**


Dr. Clawson is Director for Research at The Washington Institute for Near East Policy. His previous positions include five years as senior research professor at the Institute for National Strategic Studies of the National Defense University and senior economist for four years each at the Foreign Policy Research Institute, the World Bank, and the International Monetary Fund.


Dr. Clawson speaks often about Iran for U.S. government audiences, including for the Office of the Director of National Intelligence, the United States Central Command, the U.S. Army's Central Command, various offices at the State Department (including briefing U.S. ambassadors to Middle Eastern countries), and tours arranged by several U.S. embassies.  He has lectured about Iran and Middle East politics in more than twenty countries, including Saudi Arabia, the U.A.E., Kuwait, Bahrain, Israel, Russia, China, Britain, France, Germany, Italy, Spain, the Netherlands, Belgium, Austria, Poland, Portugal, the Czech Republic, Australia, and Canada.


Dr. Clawson has testified often about Iran before the House International Relations, National Security, and Banking and Financial Services Committees and the Senate Foreign Relations and Banking Committees. From 2009 through 2014, he served on the Distinguished Advisory Panel of the Department of Energy's Sandia National Laboratory, which is the lead actor on many nuclear security issues. From 1994 to 2012, Dr. Clawson was senior editor of *Middle East Quarterly*. From 1990 through 1994, he was editor of *Orbis*, a foreign policy quarterly.

1

Dr. Clawson has written extensively about Iran including for *The New Republic* as well as op-ed articles in *New York Times*, *Wall Street Journal*, and *Washington Post*, among other newspapers. He is the author of more than thirty scholarly articles in *Foreign Affairs*, *Survival, Washington Quarterly*, *International Journal of Middle East Studies*, *Middle East Journal*, *Les Cahiers de l'Orient*, and *Oxford Bulletin of Economics and Statistics*, among other journals.

Dr. Clawson most recent co-authored book, *The Monetary History of Iran From the Safavids to the Qajars* (I.B. Tauris, 2013), with Rudi Matthee and Willem Floor, won the Middle East Studies Association of North America's Pourshariati Award for best book about Iran. His 14 other books and monographs about Iran include: *Preventing an Iranian Nuclear Breakout: U.S.-Israel Coordination* (The Washington Institute for Near East Policy, 2012, with David Makovsky); *An Iranian Nuclear Breakout Is Not Inevitable* (The Washington Institute for Near East Policy, 2011); *Engaging Iran: Lessons from the Past* (The Washington Institute for Near East Policy, 2009, edited); *The Last Resort: Consequences of Preventive Military Action Against Iran* (The Washington Institute for Near East Policy, 2008, with Michael Eisenstadt); and *Deterring the Ayatollahs: Complications in Applying Cold War Strategy to Iran* (The Washington Institute for Near East Policy, 2007, edited with Michael Eisenstadt); and *Eternal Iran: Continuity and Chaos* (Palgrave, 2005, with Michael Rubin). He has also written or edited seven monographs and books on other issues about the Middle East, such as energy security.

2

Dr. Clawson has been an expert witness about Iran in thirty federal court cases, mostly about Iran's support for terrorism.  Those case include: including *Cicippio v. Islamic Republic of Iran*, 18 F. Supp.2d 62, 68 (D. D.C. 1998); *Flatow v. Islamic Republic of Iran*, 999 F. Supp. 1, 8-9 (D.D.C. 1998); *Cronin v. Islamic Republic of Iran*, U.S.D.C., D.C. No. 99-02890 (1999); *Higgins v. Islamic Republic of Iran*, U.S.D.C., D.C. No. 99-00377 (1999); *Stehem v. Islamic Republic of Iran*, U.S.D.C., D.C. No. 00-00159 (2000); *Hegna v. Islamic Republic of Iran*, U.S.D.C., D.C. No. 00-00716 (2000); *Anderson v. Islamic Republic of Iran*, 90 F. Supp. 2d 107, 112-113 (D.D.C. 2000);  *Eisenfeld v. Islamic Republic of Iran*, 172 F. Supp. 2d 1, 5 (D.D.C. 2000); *Elahi v. Islamic Republic of Iran*, U.S.D.C., D.C. No. 99-02802 (1999); *Wagner v. Islamic Republic of Iran*, U.S.D.C., D.C. No. 00-017999; *Polhill v. Islamic Republic of Iran*, U.S.D.C., D.C. No. 00-01798 (2000); *Mousa v. Islamic Republic of Iran*, 238 F. Supp. 2d 1, 3-4 (D.D.C. 2001); *Raffi v. Islamic Republic of Iran*, U.S.D.C., D.C. No. 01-850 (2001); *Kerr v. Islamic Republic of Iran*, U.S.D.C., D.C. No. 01-01994 (2001); *Surette v. Islamic Republic of Iran*, U.S.D.C., D.C. No. 01-00570 (2001); *Weinstein v. Islamic Republic of Iran*, 184 F. Supp. 2d 13, 19 (D.D.C. 2002); *Ungar v. Islamic Republic of Iran*, 271 F. Supp. 2d 91, 93 (D.D.C. 2002); *Stern v. Islamic Republic of Iran*, 271 F. Supp. 2d 286, 288 (D.D.C. 2003); *Rieger v. Islamic Republic of Iran*, 281 F. Supp. 2d 87, 90 (D.D.C. 2003); *Campuzano v. Islamic Republic of Iran*, 281 F. Supp. 2d 258, 262 (D.D.C. 2003); *Greenbaum v. Islamic Republic of Iran*, No. 02-2148, 2006 WL 2374221 at * 3 (D.D.C. Aug. 10, 2006); *Levin v. Islamic Republic of Iran*, U.S.D.C., D.C. No. 05-2494 (2007); *Owens v. Republic of Sudan*, et al., No. 01-2244, 2011 U.S. Dist. LEXIS 135961 (D.D.C. Nov. 28, 2011); *In Re Terrorist Attacks on September 11, 2001*, No. 03-MDL-1570 (S.D.N.Y. Dec. 22, 2011), among others.

3

Dr. Clawson's Ph.D. in economics is from the New School for Social Research and his B.A. is from Oberlin College. He speaks fluently Persian and French , as well as some Hebrew, Spanish, and German.

4