## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

|  |  |
|---|---|
| SHMUEL ELIMELECH BRAUN, *et al.*,<br><br>Plaintiffs,<br><br>v.<br><br>ISLAMIC REPUBLIC OF IRAN, *et al.*,<br><br>Defendants. | Civil Action No. 15-cv-1136 (BAH)<br><br>Chief Judge Beryl A. Howell |

### <u>MEMORANDUM OPINION</u>

     Chaya Zissel Braun, an infant, was with her two parents in Jerusalem on October 22, 2014, when she was killed in a vehicular attack (the "Attack"). *See* Consolidated Compl. ("Compl.") ¶¶ 1, 3, ECF No. 14. Her family members and estate initiated this action against the Islamic Republic of Iran ("Iran"), the Iranian Ministry of Information and Security ("MOIS"), and the Syrian Arab Republic ("Syria") under the Foreign Sovereign Immunities Act ("FSIA"), 28 U.S.C. § 1602, *et seq.*, asserting claims for damages caused by the killing, allegedly perpetrated by Hamas with material support from the defendants. *Id.* ¶¶ 1–10. The defendants never entered appearances in or defended against this action, and the plaintiffs now seek default judgment. *See* Pls.' Mot. J. Default & Schedule Evidentiary Hr'g ("Pls.' Mot."), ECF No. 31. For the reasons discussed below, the motion for default judgment is granted.

### I.    BACKGROUND

     The factual background surrounding the terrorist attack at issue is summarized below, followed by an overview of the procedural history of this case. The factual background is based

upon allegations in the Complaint, as well as the detailed declarations submitted by the plaintiffs in support of their motion for default.[1]

### A.    The Defendants' Support of Hamas

"Hamas is a radical terrorist organization . . . established by Islamic militants in 1987" and constitutes "the Palestinian branch of the extremist Muslim Brotherhood organization." Compl. ¶ 11.  The organization "views Israel and the United States as the greatest enemies of Islam" and "opposes a peaceful resolution of the Middle East conflict," having as its "openly-declared goal . . . the creation of an Islamic state in the territory of Israel, the West Bank and the Gaza Strip, and the destruction of the State of Israel and the murder or expulsion of its Jewish residents." *Id.* ¶¶ 12–13.  "Hamas proudly and openly acknowledges that it uses terrorism to

---

[1]     The plaintiffs have submitted a total of eighteen sworn declarations setting out the factual basis supporting their claims. These declarations include five by experts: (1) Dr. Patrick Clawson, "an expert on the Islamic Republic of Iran," Pls.' Mot., Ex. 1, Decl. Patrick L. Clawson ("Clawson Expert Decl.") ¶ 1, ECF No. 31-1, (2) Dr. Marius Deeb, "a leading authority in Middle Eastern politics and history" who has "extensively studied the relationship between terror groups, such as Hamas and Hezbollah, and the regimes that sponsor them, *i.e.*, Iran and Syria," *id.*, Ex. 2, Decl. Marius Deeb ("Deeb Expert Decl.") ¶ 1, ECF No. 31-2, (3) Dr. Arieh Dan Spitzen, "an expert in Palestinian affairs and society," including "the civilian infrastructures of . . . terror groups, in particular Hamas," *id.*, Ex. 3, Decl. Arieh Dan Spitzen ("Spitzen Expert Decl.") ¶ 1, ECF No. 31-3, (4) Dr. Matthew Levitt, "a noted expert in international terrorism, with a focus on Middle East terrorist groups," Pls.' Suppl. Mot. J. Default & Schedule Evidentiary Hr'g ("Pl's Suppl. Mot."), Ex. 17, Decl. Dr. Matthew Levitt ("Levitt Expert Decl.") ¶ 1, ECF No. 33-1, and (5) Dr. Benedetta Berti, who has "researched Syria and Hamas and other Palestinian armed and political groups since 2007," *id.*, Ex. 18, Decl. Benedetta Berti ("Berti Expert Decl.") ¶ 2, ECF No. 33-2.  In addition, each of the plaintiffs, who are six family members of Chaya Zissel Braun, have submitted declarations: (1) Chana Braun, Chaya Zissel's mother, *see* Pls.' Mot., Ex. 4, Decl. Pl. Chana Braun ("Chana Braun Decl."), ECF No. 31-4, (2) Shmuel Elimelech Braun, Chaya Zissel's father, *id.*, Ex. 5, Decl. Pl. Shmuel Elimelech Braun ("Shmuel Braun Decl."), ECF No. 31-5, (3) Esther Braun, Shmuel's mother, *id.*, Ex. 6, Decl. Esther Braun ("Esther Braun Decl."), ECF No. 31-6, (4) Murray Braun, Shmuel's father, *id.*, Ex. 7, Decl. Murray Braun ("Murray Braun Decl."), ECF No. 31-7, (5) Sara Halperin, Chana's mother, *id.*, Ex. 8, Decl. Sara Halperin ("Sara Halperin Decl."), ECF No. 31-8, and (6) Shimshon Halperin, Chana's father, *id.*, Ex. 8, Decl. Shimshon Halperin ("Shimshon Halperin Decl."), ECF No. 31-9. Additional declarations have been submitted by two medical professionals: (1) Dr. Alan Friedman, who performed a physical examination of Shmuel Braun following the Attack, *id.*, Ex. 10, Alan Friedman, M.D. ("Friedman Expert Decl."), ECF No. 31-10, and (2) Dr. Rael Strous, "a Medical Doctor specializing in psychiatry," who examined the plaintiffs, *id.*, Ex. 11, Expert Decl. Dr. Rael Strous Re: Chana Braun ("Strous Expert Decl. Re: Chana Braun") ¶ 1, ECF No. 31-11; *id.*, Ex. 12, Expert Decl. Dr. Rael Strous Re: Samuel [sic] Braun ("Strous Expert Decl. Re: Shmuel Braun"), ECF No. 31-12; *id.*, Ex. 13, Expert Decl. Dr. Rael Strous Re: Esther Braun ("Strous Expert Decl. Re: Esther Braun"), ECF No. 31-13; *id.*, Ex. 14, Expert Decl. Dr. Rael Strous Re: Murray Braun ("Strous Expert Decl. Re: Murray Braun"), ECF No. 31-14; *id.*, Ex. 15, Expert Decl. Dr. Rael Strous Re: Sara Halperin ("Strous Expert Decl. Re: Sara Halperin"), ECF No. 31-15; and *id.*, Ex. 16, Expert Decl. Dr. Rael Strous Re: Sam [sic] Halperin ("Strous Expert Decl. Re: Shimshon Halperin"), ECF No. 31-16.

achieve its political goals . . . [and] has carried out thousands of terrorist attacks in Israel, the West Bank and the Gaza Strip." *Id.* ¶¶ 13–14.  The United States government has categorized Hamas as a "Specially Designated Terrorist" since 1995, a "Foreign Terrorist Organization" since 1997, and a "Specially Designated Global Terrorist" since 2001.  *Id.* ¶ 17.

Since 1984, Iran "has been continuously designated by the United States Department of State as a state sponsor of terrorism."  *Id.* ¶ 18.  In the 1980s, Iran and Hamas reached an agreement, remaining in force today, under which "Hamas undertook to carry out acts of extrajudicial killing and terrorism against Jews in Israel, the West Bank and Gaza, and in return Iran undertook to provide Hamas with financial support to carry out such extrajudicial killings and terrorist attacks."  *Id.* ¶ 20.  In funding Hamas, Iran and MOIS intended to assist Hamas in "terrorizing the Jewish civilian population in Israel and weakening Israel's economy, social fabric, and military strength and preparedness" through "acts of extrajudicial killing and international terrorism" including the Attack.  *Id.* ¶ 19.

Iran's support for Hamas has been well-documented in the U.S. Department of State's annual reports on terrorism, which noted in 2014 that "Iran has historically provided weapons, training, and funding to Hamas and other Palestinian terrorist groups," and that while "Hamas's ties to Tehran have been strained due to the Syrian civil war," Iranian and Hamas leaders have nevertheless affirmed a continuing relationship.  Clawson Expert Decl. ¶ 31 (quoting the U.S. Department of State's 2014 annual report on terrorism).  In 2003, the U.S. Department of State indicated that "Iranian state sponsorship of Hamas is critical not only in terms of providing the material and funds with which to carry out terrorist operations, but also the rhetorical support necessary to keep up the pace of such operations."  Levitt Expert Decl. ¶ 39.

Since 1979, Syria, too, "has been continuously designated by the United States Department of State as a state sponsor of terrorism." *Id.* ¶ 27.  Like Iran, Syria reached an agreement with Hamas in the 1980s under which "Hamas undertook to carry out acts of extrajudicial killing and terrorism against Jews in Israel, the West Bank and Gaza, and in return Syria undertook to provide Hamas with material support and resources to carry out such extrajudicial killings and terrorist attacks." *Id.* ¶ 29.  In the years preceding the Attack, Syria provided, *inter alia*, financial support, arms, "training for the planning and execution of terrorist attacks," and "safe haven and refuge" to Hamas and its operatives.  *Id.* ¶¶ 30–34.

Notably, Syria served as a "planning hub" for Hamas leadership for many years, Berti Expert Decl. ¶ 37, and, while exercising "de facto control of Lebanon . . . granted Hamas the ability to be present in a limited manner in both Lebanon and Syria," *id.* ¶ 39.  While under Syria's protection, "Hamas was able to organize political events from Damascus," *id.* ¶ 40, as well as to "access both [Syria's] military strategists and . . . [another known terrorist organization's] resources in Lebanon, from which Hamas was able to learn terrorist strategies," Deeb Expert Decl. ¶ 23.  While Syria no longer supports Hamas because of that organization's support for rebel forces in the Syrian civil war, Hamas continues to use "the tactical know-how which Hamas gained while under Syrian protection."  *Id.* ¶¶ 22–24.

**B.      The Attack in Jerusalem, Israel, on October 22, 2014**

On the afternoon of October 22, 2014, Abdel Rahman Shaludi, an "agent and operative of Hamas" and the nephew of the former head of its military wing, drove a car to a light rail station in Jerusalem and intentionally "drove onto the light rail tracks and rammed his vehicle into the crowd of pedestrians." *Id.* ¶¶ 37–39.  Among the crowd were Chana and Shmuel Braun, along with their infant daughter, Chaya Zissel Braun, who was in a stroller. *Id.* ¶ 39.  The car struck

the stroller, "causing [Chaya Zissel] to be thrown some ten meters into the air," before she "landed on her head on the pavement while her mother . . . screamed in horror." *Id.* "[C]onnected to a ventilator and in critical condition," Chaya Zissel was transported by rescue personnel to a nearby hospital, where "she was pronounced dead some two hours after her arrival." *Id.* ¶ 41. In addition to killing Chaya Zissel, the Attack killed one other person and "knocked over and badly injured" Shmuel. *Id.* ¶¶ 1, 39. Hamas "publicly praised the [A]ttack and referred to the attacker as a 'martyr' and 'hero.'" *Id.* ¶ 46.

### C.    The Decedent and her Family

Chaya Zissel Braun was a three-month old United States citizen living in Israel at the time of her death. *Id.* ¶ 3. Her young parents had "tried to conceive a child unsuccessfully for over a year following [their] wedding" before conceiving Chaya Zissel, Chana Braun Decl. ¶ 4, and the infant was "enjoying good health, industrious and in possession of all her faculties," Compl. ¶ 64, when the Attack occurred.

Chaya's mother, Chana Braun, a United States citizen, was walking with Chaya Zissel at the time of the Attack. After Chaya Zissel had been thrown from her stroller, Chana Braun "ran to pick her up . . . , screaming for help," and "could see that the baby's head was deformed and smashed, and that she was bleeding." Chana Braun Decl. ¶ 12. While crying out for help, Chana "heard gunshots and thought the terrorist was shooting at [them]," though she later realized the gunshots were directed at the terrorist by the police. *Id.* ¶ 13. Immediately after the Attack, Chana observed Chaya Zissel begin vomiting, which gave her hope that the infant would survive. *Id.* ¶ 14. Chana was with Chaya Zissel in the ambulance and at the hospital while medical professionals attempted to save the infant's life. *Id.* ¶¶ 16–27. Since the Attack, Chana "frequently feel[s] depressed" and in "overwhelming pain," for which concerns she began to see

a therapist.  *Id.* ¶ 37.  Some days she "can function adequately," but at other times she feels "paralyzed."  *Id.* ¶ 38.  While she and Shmuel have been "very fortunate to welcome [a] second baby," Chaya Zissel's death has "somewhat affected [Chana's] ability to care for" the new child, and "[a]nything that triggers memories of Chaya Zissel causes [Chana] deep pain and feelings of loss."  *Id.* ¶¶ 41–43.

Chaya Zissel's father, Shmuel Braun, a United States citizen, was also walking with Chaya Zissel at the time of the Attack.  When Chaya Zissel was thrown out of her stroller, Shmuel "was thrown to the ground after being pushed into the moving train."  Shmuel Braun Decl. ¶ 7.  While the events immediately following the Attack are "all a blur," Shmuel knows he "was limping and in terrible pain" and was transported to the hospital with Chaya Zissel and Chana, where he was treated while Chaya Zissel was also being treated.  *Id.* ¶¶ 8–9.  He "sustained . . . several physical injuries, including broken ribs and a torn ligament in [his] knee."  *Id.* ¶ 31.  Since the Attack, Shmuel has experienced severe "emotional and psychological distress," including grief for which he began therapy and "anxiety and fear that another disaster will strike," as well as continuing physical pain in his knee.  *Id.* ¶¶ 16, 28, 31.

Shmuel's parents, Esther and Murray Braun, also United States citizens, were at home in Los Angeles, California, when the Attack occurred.  *See* Esther Braun Decl. ¶¶ 1, 11.  Chana and Chana's father, Shimshon Halperin, informed them of the Attack, which they also learned about from news outlets.  *See id.* ¶¶ 7–12; Murray Braun Decl. ¶¶ 7–14.  They experienced, and continue to experience, "constant pain" for themselves, Chana and Shmuel, and the loss of Chaya Zissel, as well as fear and sleeplessness.  Murray Braun Decl. ¶¶ 16–26; *see* Esther Braun Decl. ¶¶ 14–18.

Chana's parents, Sara and Shimshon Halperin, also United States citizens, also were not physically present at the place of the Attack; Sara had just arrived home to New York after visiting Chana, Shmuel, and Chaya Zissel in Israel, and Shimshon was still in Israel. *See* Sara Halperin Decl. ¶¶ 4–10. Sara learned of the Attack from her sister-in-law and immediately flew back to Israel, during which flight she "cried . . . and could not sleep." *Id.* ¶¶ 9–12. "Seeing [her] child in so much pain made [her] feel completely helpless," and she herself felt "excruciating" pain. *Id.* ¶ 15. Shimshon received a call from Chana about the Attack immediately after it occurred and arrived at the hospital before Chaya Zissel's death. Shimshon Halperin Decl. ¶¶ 7–9. Since the Attack, Sara "constantly feel[s] helpless because [she is] not able to relieve Chana and Shmuel of their suffering" and has found it "often difficult to connect with them." Sara Halperin Decl. ¶ 20. She also has "constant nightmares and feel[s] depressed." *Id.* ¶ 21. Shimshon has found it "difficult to communicate with Chana" and "feel[s] a sense of heaviness all the time." Shimshon Halperin Decl. ¶¶ 12–14.

## C.     Procedural History

Plaintiffs Chana and Shmuel Braun, individually and as personal representatives of the estate of Chaya Zissel Braun, filed this lawsuit against the defendants on July 15, 2015. *See* Compl. of July 15, 2015, ECF No. 1. Plaintiffs Shimshon Halperin, Sara Halperin, Murray Braun, and Esther Braun filed a separate lawsuit against the same defendants on September 20, 2015, *see* Compl., *Halperin v. Islamic Republic of Iran*, No. 15-cv-1530 (D.D.C. Oct. 20, 2015), ECF No. 1, which was consolidated with this lawsuit on October 20, 2015, *see* Min. Order, dated Oct. 20, 2015, *Halperin*, No. 15-cv-1530. The plaintiffs filed affidavits attesting that the defendants were properly served, albeit after numerous attempts, in accordance with the FSIA, which provides the procedure for completing service upon a foreign state or political subdivision

of a foreign state.  Aff. Supp. Default, ECF No. 26; Aff. Supp. Default, ECF No. 29.  The Clerk

entered default against Syria on February 8, 2016, *see* Entry of Default, ECF No. 27, and against

Iran and MOIS on March 23, 2016, *see* Entry of Default, ECF No. 30.  The plaintiffs

subsequently filed the instant motion for default judgment.  *See* Pls.' Mot.  The plaintiffs'

briefing, with over four hundred pages in exhibits, was comprehensive, and, thus, an evidentiary

hearing is unnecessary.[2]

## II.    LEGAL STANDARD

Under Federal Rule of Civil Procedure 55(b)(2), the Court may consider entering a

default judgment when a party applies for that relief.  *See* FED. R. CIV. P. 55(b)(2).  "[S]trong

policies favor resolution of disputes on their merits," and therefore, "[t]he default judgment must

normally be viewed as available only when the adversary process has been halted because of an

essentially unresponsive party."  *Jackson v. Beech*, 636 F.2d 831, 836 (D.C. Cir. 1980) (quoting

*H.F. Livermore Corp. v. Aktiengesellschaft Gebruder Loepfe*, 432 F.2d 689, 691 (D.C. Cir.

1970)).

Notwithstanding its appropriateness in some circumstances, "entry of a default judgment

is not automatic."  *Mwani v. bin Laden*, 417 F.3d 1, 6 (D.C. Cir. 2005) (footnote omitted).  Thus,

the procedural posture of a default does not relieve a federal court of its "affirmative obligation"

to determine whether it has subject matter jurisdiction over the action.  *James Madison Ltd. by*

*Hecht v. Ludwig*, 82 F.3d 1085, 1092 (D.C. Cir. 1996).  Additionally, "a court should satisfy

itself that it has personal jurisdiction before entering judgment against an absent defendant," but

---

[2]       In response to the Court's Minute Order, dated November 9, 2016, the plaintiffs advised the Court that "if
the Court finds the affidavit evidence and attachments to be 'satisfactory,' plaintiffs will be pleased to rest on those
submissions as the evidence in support of the default judgment and agree that no evidentiary hearing is necessary."
Pls.' Resp. Nov. 9, 2016 Order Court at 2, ECF No. 34.  To establish the legal and factual bases for their claims, the
plaintiffs submitted the well-supported declarations described *supra* in note 1.  The Court concludes that no
evidentiary hearing is necessary for further evaluation of the declarations submitted by the plaintiffs.  Consequently,
the plaintiffs' motion, ECF No. 31, for an evidentiary hearing is denied.

"[i]n the absence of an evidentiary hearing, although the plaintiffs retain 'the burden of proving personal jurisdiction, they can satisfy that burden with a *prima facie* showing.'" *Mwani*, 417 F.3d at 6–7 (quoting *Edmond v. U.S. Postal Serv. Gen. Counsel*, 949 F.2d 415, 424 (D.C. Cir. 1991)).  In doing so, "they may rest their argument on their pleadings, bolstered by such affidavits and other written materials as they can otherwise obtain." *Id.* at 7.

Finally, when default is sought under the FSIA, a claimant must "establish[] his claim or right to relief by evidence satisfactory to the court." 28 U.S.C. § 1608(e). "This provides foreign sovereigns a special protection akin to that assured the federal government by FED. R. CIV. P. 55(e)," which has been renumbered by the 2007 amendment to Rule 55(d). *Jerez v. Republic of Cuba*, 775 F.3d 419, 423 (D.C. Cir. 2014); *see also* H.R. REP. No. 94-1487, at 26 (1976) (stating that § 1608(e) establishes "the same requirement applicable to default judgments against the U.S. Government under rule 55(e), F.R. Civ. P.").  While the "FSIA leaves it to the court to determine precisely how much and what kinds of evidence the plaintiff must provide, requiring only that it be 'satisfactory to the court,'" courts must be mindful that Congress enacted Section 1605A, FSIA's terrorism exception, and Section 1608(e) with the "aim[] to prevent state sponsors of terrorism—entities particularly unlikely to submit to this country's laws—from escaping liability for their sins." *Han Kim v. Democratic People's Republic of Korea*, 774 F.3d 1044, 1047–48 (D.C. Cir. 2014) (quoting 28 U.S.C. § 1608(e)).

With this objective in mind, the D.C. Circuit has instructed that "courts have the authority—indeed, we think, the obligation—to 'adjust [evidentiary requirements] to . . . differing situations.'" *Id.* (quoting *Bundy v. Jackson*, 641 F.2d 934, 951 (D.C. Cir. 1981)).  Courts must draw their "findings of fact and conclusions of law from admissible testimony in accordance with the Federal Rules of Evidence." *Id.* at 1049 (quoting *Daliberti v. Republic of*

*Iraq*, 146 F. Supp. 2d 19, 21 n.1 (D.D.C. 2001)).  Uncontroverted factual allegations that are supported by admissible evidence are taken as true.  *Roth v. Islamic Republic of Iran*, 78 F. Supp. 3d 379, 386 (D.D.C. 2015) ("Courts may rely on uncontroverted factual allegations that are supported by affidavits." (citing *Rimkus v. Islamic Republic of Iran*, 750 F. Supp. 2d 163, 171 (D.D.C. 2010))); *Gates v. Syrian Arab Republic*, 580 F. Supp. 2d 53, 63 (D.D.C. 2008) (quoting *Estate of Botvin v. Islamic Republic of Iran*, 510 F. Supp. 2d 101, 103 (D.D.C. 2007)), *aff'd*, 646 F.3d 1 (D.C. Cir. 2011); *accord* FED. R. CIV. P. 56(e)(2) (authorizing court to "consider the fact undisputed for purposes of the motion" when adverse party "fails to properly address another party's assertion of fact").

## III.    DISCUSSION

A default judgment may be entered when (1) the Court has subject matter jurisdiction over the claims, (2) personal jurisdiction is properly exercised over the defendants, (3) the plaintiffs have presented satisfactory evidence to establish their claims against the defendants, and (4) the plaintiffs have satisfactorily proven that they are entitled to the monetary damages they seek.  Each of these requirements is addressed *seriatim* below.

### A.    Subject Matter Jurisdiction Under the FSIA

This Court may exercise "original jurisdiction" over a foreign state "without regard to amount in controversy" in "nonjury civil action[s]" seeking "relief *in personam* with respect to which the foreign state is not entitled to immunity either under sections 1605–1607 of this title or under any applicable international agreement."  *See* 28 U.S.C. § 1330(a).  Here, while the plaintiffs have demanded "trial by jury of all issues legally triable to a jury," Compl. at 21, no jury trial is available for FSIA claims, *see Rishikof v. Mortada*, 70 F. Supp. 3d 8, 16 (D.D.C. 2014) ("[In] crafting . . . exception[s] to sovereign immunity, Congress was careful to maintain

the international standard that a foreign state shall not be subject to a jury trial."), and thus this action is a "nonjury civil action."  Moreover, the plaintiffs bring civil claims against the defendants as foreign sovereigns for *in personam* relief.[3]  Thus, the only remaining question is whether the defendants are entitled to immunity under the FSIA or another international agreement.

Foreign governments are generally immunized from lawsuits brought against them in the United States unless an FSIA exception applies.  *See* 28 U.S.C. § 1604; *Mohammadi v. Islamic Republic of Iran*, 782 F.3d 9, 13 (D.C. Cir. 2015).  The plaintiffs invoke jurisdiction under § 1605A of the FSIA, which provides that "[a] foreign state shall not be immune from the jurisdiction of courts of the United States or of the States in any case . . . in which money damages are sought against a foreign state for personal injury or death that was caused by an act of torture, extrajudicial killing, aircraft sabotage, hostage taking, or the provision of material support or resources for such an act . . . ."  28 U.S.C. § 1605A.  The plaintiffs must prove four elements to establish subject matter jurisdiction under this exception: (1) "the foreign country was designated a 'state sponsor of terrorism at the time of the act,'" *Mohammadi*, 782 F.3d at 14 (quoting 28 U.S.C. § 1605A(a)(2)(A)(i)(I)); (2) "the 'claimant or the victim was' a 'national of the United States' at that time," *id.* (quoting 28 U.S.C. § 1605A(a)(2)(A)(ii)); (3) "in a case in which the act occurred in the foreign state against which the claim has been brought, the claimant has afforded the foreign state a reasonable opportunity to arbitrate the claim," 28 U.S.C. § 1605A(a)(2)(A)(iii); and (4) the plaintiff seeks monetary damages "for personal injury or death caused by 'torture, extrajudicial killing, aircraft sabotage, hostage taking, or the provision of

---

[3]       Iran and Syria are indisputably foreign sovereigns, and MOIS, which is a "political subdivision" of Syria, is also considered a foreign sovereign for the purposes of this lawsuit under 28 U.S.C. § 1603(a).  *See Roeder v. Islamic Republic of Iran,* 333 F.3d 228, 234 (D.C. Cir. 2003) ("[T]he Ministry of Foreign Affairs must be treated as the state of Iran itself rather than as its agent.").

material support or resources for such an act,' if 'engaged in by an official, employee, or agent' of a foreign country," *Mohammadi*, 782 F.3d at 14 (quoting 28 U.S.C. § 1605A(a)(1)).  These four elements have been satisfactorily proven here.

With respect to the first element, both Iran and Syria have been designated as state sponsors of terrorism by the U.S. Department of State for more than two decades.  *See* Compl. ¶¶ 8, 10; *see also Anderson v. Islamic Republic of Iran*, 753 F. Supp. 2d 68, 76 (D.D.C. 2010) ("Iran . . . has been designated a state sponsor of terrorism . . . since January 19, 1984." (internal quotation marks omitted)); *Gates*, 646 F.3d at 2 ("Syria has been designated a state sponsor of terrorism since 1979.").

As to the second element, the plaintiffs have averred in sworn declarations that they and Chaya Zissel Braun were United States citizens at the time of the Attack.  *See* Chana Braun Decl. ¶ 2 (stating "Chaya Zissel Braun . . . was . . . a U.S. citizen who was living in Israel at the time of her tragic death"); *id.* ¶ 1 (attesting to the declarant's U.S. citizenship); Shmuel Braun Decl. ¶ 1 (same); Esther Braun Decl. ¶ 1 (same); Murray Braun Decl. ¶ 1 (same); Sara Halperin Decl. ¶ 1 (same); Shimshon Halperin Decl. ¶ 1 (same).

The plaintiffs in this case need not satisfy the third element because the Attack took place in Israel, not Iran or Syria, and thus the statutory requirement of "afford[ing] the foreign state a reasonable opportunity to arbitrate the claim" before bringing this action does not apply.  28 U.S.C. § 1605A(a)(2)(A)(iii).

Finally, the plaintiffs have produced satisfactory evidence to establish the fourth element: that their damages arise from the defendants' "provision of material support or resources" for the extrajudicial killing of Chaya Zissel Braun.  28 U.S.C. § 1605A(a)(1).  The plaintiffs have established that the Attack was perpetrated by Hamas, which has received long-standing material

support and resources from the defendants. As the plaintiffs' expert Arieh Dan Spitzen explains, while Hamas "did not claim responsibility" for the Attack, Spitzen Expert Decl. ¶ 57, "Hamas recognized Abd al-Rahman al-Shaludi as its operative" prior to the Attack, *id.* ¶¶ 31, 48, and following the Attack issued a death notice indicating that Hamas "mourns the death of its son, the martyr, the hero Abd al-Rahman Idris al-Shaludi, 23, who carried out the daring action in Jerusalem," *id.* ¶ 50 (alterations omitted). The "avoid[ance of] any explicit statement of responsibility" is "consistent with [Hamas's] method of operation" in its terrorist activities. *Id.* ¶ 57. The plaintiffs have also established that the defendants provided "material support," defined as "any property . . . or service, including . . . financial services, lodging, training, . . . safehouses, . . . facilities, . . . and transportation, except medicine or religious materials," 18 U.S.C. § 2339A(b)(1), to Hamas for the Attack. Specifically, the plaintiffs' experts on Iran aver that Iran provides financial assistance to Hamas in fluctuating but significant sums each year, *see* Levitt Expert Decl. ¶¶ 48–50, 68–69, as well as weapons and military training, *see id.* ¶¶ 48, 51, 56, 63–65, and that, "[w]hile Iran's relationship with Hamas has waxed and waned over the years, Iran never cut off all its support for Hamas even during periods when the relation was cool, and when the relationship was warm, Iran provided substantial military and financial support," Clawson Expert Decl. ¶ 35. The plaintiffs' experts on Syria attest that Syria "set[] up Damascus as a diplomatic and public relations base" for Hamas, Berti Expert Decl. ¶ 40, supported Hamas financially, logistically, and organizationally before the "cooling off" period that began in 2012, *id.* ¶¶ 42–45 and that Hamas's "terror operations since 2012, including the attacks it carried out in 2014, were made possible because of Syria's massive support for the organization from the early to mid-1990's through 2012," Deeb Expert Decl. ¶ 25.[4]

---

[4] Other courts confronted with similar types of material support have found sufficient causation between the resources provided and the harm eventually inflicted. *See, e.g., Roth*, 78 F. Supp. 3d at 394 (holding that the

In addition, the plaintiffs have demonstrated that the killing of Chaya Zissel was an extrajudicial one.  "[E]xtrajudicial killing" has the "meaning given . . . in section 3 of the Torture Victim Protection Act of 1991," 28 U.S.C. § 1605A(h)(7), which, in turn, defines this term to mean "a deliberated killing not authorized by a previous judgment pronounced by a regularly constituted court affording all the judicial guarantees which are recognized as indispensable by civilized people," Pub. L. No. 102-256, § 3(a), 106 Stat. 73, 73 (1992) (codified at 28 U.S.C. § 1350 note § 3(a)).  The plaintiffs have attested that Chaya Zissel was killed as a result of the driver of a car intentionally driving the vehicle into a crowd of pedestrians at a light rail station. *See, e.g.,* Chana Braun Decl. ¶¶ 8–10.  No "regularly constituted court affording all the judicial guarantees which are recognized as indispensable by civilized people" could have authorized such a killing.  Thus, the plaintiffs' evidence suffices to demonstrate that their claims arise from an extrajudicial killing for which the defendants provided material support.

Accordingly, the defendants do not enjoy foreign sovereign immunity from the instant suit, pursuant to 28 U.S.C. § 1605A, and subject matter jurisdiction may be properly exercised pursuant to 28 U.S.C. § 1330(a).

### B.      Personal Jurisdiction

The Court next examines whether effective service has been made, as required by 28 U.S.C. § 1330(b), which governs personal jurisdiction over foreign states.  *See* 28 U.S.C. § 1330(b) (providing that "[p]ersonal jurisdiction over a foreign state shall exist as to every claim for relief over which the district courts have jurisdiction . . . where service has been made under section 1608 of this title").  Service may be effected under 28 U.S.C. § 1608 in one of four ways:

---

plaintiffs have demonstrated "a reasonable connection" between defendants' acts and their damages where the defendants provided "money and training," and "encouraged the escalation of terrorist activities" (internal quotation marks omitted)).

(1) by "special arrangement for service between the plaintiff and the foreign state," (2) "in accordance with an applicable international convention on service of judicial documents," or, if the first two options are not applicable, (3) by "sending a copy of the summons and complaint and a notice of suit, together with a translation of each into the official language of the foreign state, by any form of mail requiring a signed receipt, to be addressed and dispatched by the clerk of the court to the head of the ministry of foreign affairs of the foreign state concerned," or, if service cannot be made under the third option, (4) by requesting the Clerk of the Court to send the aforementioned package to "the Secretary of State in Washington, District of Columbia, to the attention of the Director of Special Consular Services—and the Secretary shall transmit one copy of the papers through diplomatic channels to the foreign state and shall send to the clerk of the court a certified copy of the diplomatic note indicating when the papers were transmitted." 28 U.S.C. § 1608(a).

The defendants have neither made a special arrangement for service with the plaintiffs nor entered into any international convention governing service, instead ultimately serving Syria in the third way and Iran and MOIS in the fourth way authorized under Section 1608. The necessary papers were mailed through DHL and delivered to Syria on November 29, 2015, *see* Return Serv./Aff., ECF No. 25, and to Iran and MOIS "under cover of diplomatic notes" on January 13, 2016, *see* Aff. Serv., ECF No. 28.

Accordingly, the plaintiffs have established that service was properly effected against the defendants and, thus, personal jurisdiction is properly exercised.

### C.     The Defendants' Liability

The six plaintiffs in this action bring nine claims under 28 U.S.C. § 1605A(c), on behalf of themselves and the estate of Chaya Zissel Braun, for wrongful death, survival, battery, assault,

intentional infliction of emotional distress, negligent infliction of emotional distress, conspiracy "to facilitate and cause acts of international terrorism, extrajudicial killing and personal injury," aiding and abetting such acts, and vicarious liability, *see* Compl. ¶¶ 60–106, for which claims they seek compensatory damages for "loss of guidance, companionship and society, loss of consortium, severe emotional distress and mental anguish, loss of solatium; and pecuniary loss and loss of income," *id.* ¶ 56, as well as "punitive damages," *id.* ¶ 71.[5]  Section 1605A(c) provides a federal private right of action against designated state sponsors of terrorism for enumerated categories of persons, including "a national of the United States" or her "legal representative," for "personal injury or death caused by . . . that foreign state . . . for which the courts of the United States may maintain jurisdiction . . . for money damages."  28 U.S.C. § 1605A(c).  Successful plaintiffs may recover damages that "include economic damages, solatium, pain and suffering, and punitive damages."  *Id.*

Although Section 1605A(c) provides a private right of action, it provides no guidance on the substantive bases for liability to determine plaintiffs' entitlement to damages.  Consequently, courts have applied "general principles of tort law," such as the RESTATEMENT (SECOND) OF TORTS, to determine liability.  *Estate of Heiser v. Islamic Republic of Iran*, 659 F. Supp. 2d 20, 24 (D.D.C. 2009); *see Roth*, 78 F. Supp. 3d at 399 (citing *Oveissi v. Islamic Republic of Iran*, 879 F. Supp. 2d 44, 54 (D.D.C. 2012)); *Worley v. Islamic Republic of Iran*, 75 F. Supp. 3d 311, 335 (D.D.C. 2014).  The availability of these claims for each plaintiff is discussed in detail below.

---

[5]     The complaint denominates ten separate counts, but one of these purported claims amounts only to a request for damages under § 1605A.  *See* Compl. (First Claim for Relief for Damages Under 28 U.S.C. § 1605A(c)). In addition, the conspiracy, aiding and abetting, and vicarious liability claims need not be addressed separately in view of this Court's determination, discussed *supra* in Part III.A, that the defendants provided material support to Hamas, which also establishes their liability for acts, such as the Attack, perpetrated by Hamas.

### 1. *Chaya Zissel Braun's Estate*

Chaya Zissel Braun, represented in this action by her estate, was a United States citizen at the time of the Attack and, therefore, is expressly covered by, and entitled to bring claims under, Section 1605A(c).

### a. **Wrongful Death**

Chaya Zissel Braun's estate may recover for her wrongful death on the instant claims upon establishing that the defendants caused her death. *See* RESTATEMENT (SECOND) OF TORTS § 925. As discussed *supra* in Part III.A, the plaintiffs have submitted satisfactory evidence demonstrating that Chaya Zissel Braun's death was an extrajudicial killing perpetrated by Hamas, who received material support from the defendants, and, as a result, the defendants are liable to her estate for "economic losses which result from [the] decedent's premature death." *Valore v. Islamic Republic Iran*, 700 F. Supp. 2d 52, 78 (D.D.C. 2010) (quoting *Flatow v. Islamic Republic of Iran*, 999 F. Supp. 1, 27 (D.D.C. 1998)); *see also Worley*, 75 F. Supp. 3d at 335.

### b. **Survival**

A survival action accrues upon the death of an injured person and "limits recovery for damages for loss or impairment of earning capacity, emotional distress and all other harms, to harms suffered before the death." RESTATEMENT (SECOND) OF TORTS § 926. Courts have thus "awarded damages for the victim's pain and suffering that occurred between the attack and the victim's death shortly thereafter." *Haim v. Islamic Republic of Iran*, 425 F. Supp. 2d 56, 71 (D.D.C. 2006). "In the absence of evidence tending to show an attack resulted in the fatal but noninstantaneous injury of a victim and that the victim was conscious thereafter, . . . an award of pain and suffering is inappropriate." *Worley*, 177 F. Supp. 3d at 286. In addition, "a court must

refuse to award damages for pain and suffering if the plaintiff is unable to prove that the decedent consciously experienced the time between an attack and his or her death." *Roth*, 78 F. Supp. 3d at 402.

In this case, the plaintiffs assert that "Chaya Zissel Braun suffered great conscious pain, shock and physical and mental anguish" after the Attack and before her death. Compl. ¶ 69. In support of this assertion, the plaintiffs aver that Chaya Zissel was "sent flying" from her stroller by the Attack, with the subsequent impact causing her head to be "deformed and smashed" and her to "beg[i]n vomiting." Chana Braun Decl. ¶¶ 11–12, 14. Moreover, the plaintiffs aver that Chaya Zissel "survived for approximately two hours" after the Attack before dying at a hospital, during which time "paramedics and emergency room physicians worked on her and fought to save her life," including by resuscitating her when at one point she stopped breathing. *Id.* ¶¶ 20–30. These averments, which establish that Chaya Zissel was thrown into the air and then landed in an impact that, while ultimately fatal, did not kill her instantaneously, suffice to demonstrate she experienced pain and suffering resulting from the Attack and prior to her death, and thus that the defendants are liable to her estate for survival damages.

### 2. *Chana and Shmuel Braun*

Chaya Zissel Braun's parents, Chana and Shmuel Braun, who were present at the time of the Attack, seek to recover on their own behalf for wrongful death, assault, battery, intentional infliction of emotional distress, and negligent infliction of emotional distress. *See* Compl. ¶¶ 72–93. As United States citizens, they may also bring their claims under Section 1605A(c).

### a. **Wrongful Death**

In the portion of their Complaint alleging a claim of wrongful death, the plaintiffs state that the Attack "caused . . . plaintiffs Shmuel Elimelech Braun and Chana Braun severe injury,

including: pain and suffering; pecuniary loss and loss of income; loss of guidance, companionship and society; loss of consortium; severe emotional distress and mental anguish; and loss of solatium." Compl. ¶ 65. Accordingly, it appears the plaintiffs seek to recover for the emotional pain and suffering caused to Chana and Shmuel Braun by Chaya Zissel Braun's death under a claim of wrongful death, as well as their claims for intentional and negligent infliction of emotional distress. While the FSIA does not plainly forbid recovery for such harms under a claim for wrongful death, recovery for the same injury under more than one theory of liability is forbidden. *See Kassman v. Am. Univ.*, 546 F.2d 1029, 1034 (D.C. Cir. 1976) ("Where there has been only one injury, the law confers only one recovery, irrespective of the multiplicity of parties whom or theories which the plaintiff pursues."). In consideration of the bar on double recovery, along with the general practice in this Court of considering liability for the pain and suffering of family members and the wrongful death of the decedent separately, *see, e.g., Opati v. Republic of Sudan*, 60 F. Supp. 3d 68, 76 (D.D.C. 2014) (noting "the estates of those who were killed in the attack are entitled to recover compensatory damages for wrongful death" and "their immediate family members . . . can recover for solatium"), the defendants' liability to Chana and Shmuel Braun for harms resulting from Chaya Zissel Braun's wrongful death will be considered in the context of their emotional distress claims.

### b. Assault

The defendants are liable for assault on Chana and Shmuel Braun if, when they provided material support and resources for the Attack, they acted "intending to cause a harmful or offensive contact with . . . or an imminent apprehension of such a contact" with those attacked and those attacked were "thereby put in such imminent apprehension." RESTATEMENT (SECOND) OF TORTS § 21(1). The Attack and other similar acts are intended to cause harm or, at least, fear

of such harm among those targeted.  Indeed, "terrorism" is defined to mean "the use of violent

acts to frighten the people in an area as a way of trying to achieve a political goal."  Terrorism,

Merriam-Webster Dictionary Online, http://www.merriam-webster.com/dictionary/terrorism

(last visited Jan. 9, 2017).  Moreover, Chana has averred that she felt and continues to feel

anxiety as a result of the Attack, and Shmuel has stated that every day he "ha[s] a perpetual fear

that something tragic will happen," Shmuel Braun Decl. ¶ 21.  Accordingly, the plaintiffs have

demonstrated that the defendants are liable for assault.

### c.      Battery

The defendants are liable for battery if, when they provided material support and

resources for the Attack, they acted "intending to cause a harmful or offensive contact . . . or an

imminent apprehension of such a contact" with those attacked and "a harmful contact with [those

attacked] directly or indirectly results."  RESTATEMENT (SECOND) OF TORTS § 13.  "Harmful

contact" has occurred where "any physical impairment of the condition of another's body, or

physical pain or illness" results.  *Id.* § 15.  In this case, the plaintiffs allege "severe physical

injuries" only as to Shmuel, asserting that the attack caused Chana only "severe psychological

injuries."  Compl. ¶¶ 73–74.  Consequently, Shmuel, but not Chana, may be able to recover for

battery.  In his sworn declaration, Shmuel avers that, as a result of the Attack, he was "thrown to

the ground after being pushed into the moving train" and "was limping and in terrible pain."

Shmuel Braun Decl. ¶¶ 7–8.  Shmuel's examining physician, Dr. Alan Friedman, avers that

Shmuel sustained a "[r]ight medial collateral ligament tear," "[r]ight knee sprain," "[r]ight knee

contusion," and "[r]ight rib fractures."  Friedman Expert Decl. at 4–5.  Accordingly, Shmuel

Braun has demonstrated that the defendants are liable for battery against him.

### d.      Intentional Infliction of Emotional Distress

The defendants are liable for intentional infliction of emotional distress if they, "by extreme and outrageous conduct[,] intentionally or recklessly cause[d] severe emotional distress to" the plaintiffs. RESTATEMENT (SECOND) OF TORTS § 46(1); *see also Roth*, 78 F. Supp. 3d at 400 (quoting *Estate of Heiser*, 659 F. Supp. 2d at 26). Where the claimants were not the direct recipient of the "extreme and outrageous conduct," the Restatement permits recovery if (1) they are members of a victim's immediate family and (2) they are present at the time, or "the defendants' conduct is sufficiently outrageous and intended to inflict severe emotional harm upon a person [who] is not present." *Estate of Heiser*, 659 F. Supp. 2d at 26–27 (quoting DAN B. DOBBS, The LAW OF TORTS § 307, at 834 (2000)); *see also* RESTATEMENT (SECOND) OF TORTS § 46, cmt. l (AM. LAW INST. 1977) (leaving "open the possibility of situations in which presence at the time may not be required").

The defendants may be liable to Chana and Shmuel for intentional infliction of emotional distress both as direct recipients of the extreme and outrageous conduct and, separately, as members of Chaya Zissel's immediate family. The defendants' conduct in providing material support and resources to a known terrorist organization is extreme and outrageous. *See, e.g., Valore*, 700 F. Supp. 2d at 77 ("Acts of terrorism are by their very definition extreme and outrageous and intended to cause the highest degree of emotional distress." (quoting *Belkin v. Islamic Republic of Iran*, 667 F. Supp. 2d 8, 22 (D.D.C. 2009))). The plaintiffs have provided sworn declarations by Chana and Shmuel, *see generally* Chana Braun Decl.; Shmuel Braun Decl., as well as medical experts in psychiatry, *see generally* Strous Expert Decl. re: Chana Braun; Strous Expert Decl. re: Shmuel Braun, demonstrating that the Attack caused them extreme emotional distress, both as persons attacked and family members of Chaya Zissel Braun.

Accordingly, the defendants are liable to Chana and Shmuel Braun as both victims of the Attack and the parents of Chaya Zissel Braun for intentional infliction of emotional distress.[6]

### 3. *Esther and Murray Braun; Sara and Shimshon Halperin*

The remaining four plaintiffs are the parents of Chana and Shmuel Braun and the grandparents of Chaya Zissel Braun. They seek to recover damages for intentional infliction of emotional distress and negligent infliction of emotional distress. *See* Compl. ¶¶ 84–93. As United States citizens, they may also bring their claims under Section 1605A(c).

#### a.    Intentional Infliction of Emotional Distress

Each of these four plaintiffs is an immediate family member of Chana or Shmuel Braun, but none was present at the time of the Attack.[7] In this case, however, the defendants' conduct in materially supporting a known terrorist organization was "sufficiently outrageous and intended to inflict severe emotional harm upon a person who is not present," such that a victim's family members need not have been present to recover for their emotional distress. *Estate of Heiser*, 659 F. Supp. 2d at 27 (quoting DAN B. DOBBS, THE LAW OF TORTS § 307, at 834 (2000)); *see also Roth*, 78 F. Supp. 3d at 401; *Worley*, 75 F. Supp. 3d at 336–37; *Wyatt v. Syrian Arab Republic*, 908 F. Supp. 2d 216, 231 (D.D.C. 2012). Consequently, the defendants are liable to

---

[6]    In view of the bar on double recovery, *see Kassman*, 546 F.2d at 1034, the plaintiffs' claim of negligent infliction of emotional distress will not be addressed.

[7]    The defendants cannot be liable for the emotional distress caused to Esther and Murray Braun and Sara and Shimshon Halperin by Chaya Zissel Braun's death because Chaya Zissel is neither an immediate family member of those four plaintiffs nor the functional equivalent thereof. *See Roth*, 78 F. Supp. 3d at 400 ("The 'immediate family' requirement is strictly construed in FSIA cases; generally, only spouses, parents, siblings, and children are entitled to recover (citing *Murphy v. Islamic Republic of Iran*, 740 F. Supp. 2d 51, 75 (D.D.C. 2012))); *Valore*, 700 F. Supp. 2d at 79 (evaluating whether "plaintiffs are functional equivalents of immediate family members" such that they may bring an intentional infliction of emotional distress claim).

Esther and Murray Braun and Sara and Shimshon Halperin for intentional infliction of emotional distress caused by their extreme and outrageous conduct toward Chana and Shmuel Braun.[8]

Accordingly, the plaintiffs have established the defendants' liability to the plaintiffs under the federal private right of action against state sponsors of terrorism, 28 U.S.C. § 1605A(c), for the torts of wrongful death, assault, battery, and intentional infliction of emotional distress.  The damages allowable to the plaintiffs are discussed in the section that follows.

### D.  Damages

The plaintiffs in this case seek to recover economic, pain and suffering, solatium, and punitive damages to compensate for their own losses and to punish the defendants for their support of known terrorists.[9]  The damages to which each plaintiff is entitled are described below.

### 1.  Legal Standard for Damages under Section 1605A(c)

Congress, in creating a private right of action in Section 1605A(c) for victims of state-sponsored terrorism, also provided, in the same subsection, that such foreign states are liable for money damages, including "economic damages, solatium, pain and suffering, and punitive damages."  28 U.S.C. § 1605A(c). "To obtain damages against a non-immune foreign state under the FSIA, a plaintiff must prove that the consequences of the foreign state's conduct were reasonably certain (*i.e.*, more likely than not) to occur, and must prove the amount of damages by a reasonable estimate consistent with this [Circuit]'s application of the American rule on damages." *Roth*, 78 F. Supp. 3d at 402 (quoting *Salazar v. Islamic Republic of Iran*, 370 F.

---

[8]      *See supra* note 6.

[9]      Damages recoverable for the plaintiffs' claims of intentional infliction of emotional distress resulting from harms suffered by their immediate family members will be discussed as claims for solatium damages.  *See, e.g., Valore*, 700 F. Supp. 2d at 85 ("Under the FSIA, a solatium claim is indistinguishable from an [intentional infliction of emotional distress] claim.").

Supp. 2d 105, 115–16 (D.D.C. 2005)) (internal quotation marks omitted and alteration in original); *see also Kim v. Democratic People's Republic of Korea*, 87 F. Supp. 3d 286, 289 (D.D.C. 2015) (quoting *Hill v. Republic of Iraq*, 328 F.3d 680, 681 (D.C. Cir. 2003)).   In determining the "reasonable estimate," courts may look to expert testimony and prior awards for comparable injury.   *See Reed v. Islamic Republic of Iran*, 845 F. Supp. 2d 204, 214 (D.D.C. 2012); *Acosta v. Islamic Republic of Iran*, 574 F. Supp. 2d 15, 29 (D.D.C. 2008).

The plaintiffs have satisfactorily shown that their injuries were reasonably certain and were actually the intended consequences of the defendants' material support of Hamas.   The defendants provided material support to this known terrorist organization, *see* Clawson Expert Decl. ¶¶ 32–42; Deeb Expert Decl. ¶¶ 23–24, which has as its goal the targeting of civilians for acts of terror, *see* Clawson Expert Decl. ¶ 34; Spitzen Expert Decl. ¶ 40.   Consequently, the defendants' conduct in supporting Hamas was likely, and intended, to result in injury and death to civilians and to devastate the families of the victims.

Having concluded that the plaintiffs have proven that "the consequences of the foreign state's conduct were reasonably certain . . . to occur," *Roth*, 78 F. Supp. 3d at 402, the reasonable awards as to each plaintiff for economic loss, pain and suffering, solatium, and punitive damages will be determined next.

### 2. *Economic Losses*

Chaya Zissel Braun's estate and Chana and Shmuel Braun seek to recover for "pecuniary loss and loss of income" related to Chaya Zissel Braun's wrongful death and survival claims, Compl. ¶¶ 65, 69, as well as for "severe financial loss, including loss of future income," related to their battery claim, Compl. ¶ 74.   "Unlike damages for pain and suffering, lost earnings are not hard to quantify, and the Court will not excuse plaintiffs' failure to support the claim for lost

earnings with competent evidence." *Moradi v. Islamic Republic of Iran*, 77 F. Supp. 3d 57, 71 (D.D.C. 2015).  The plaintiffs in this case have provided no evidence supporting any such recovery.  Consequently, they have "failed to meet the minimum evidentiary threshold supporting their respective claims for economic damages," and no economic damages may be awarded.  *Kaplan v. Hezbollah*, Nos. 09-00646, 10-00483, 2016 WL 5714754, at *8 (D.D.C. Sept. 30, 2016).

### 3.   *Pain and Suffering*

As discussed above, the defendants are liable to Chaya Zissel Braun's estate for the pain and suffering she experienced after the Attack but prior to her death.  The evidence demonstrates that Chaya Zissel suffered being thrown into the air and an impact that caused her head to become smashed and her to begin vomiting and that she survived for two hours after the Attack, during which time she was attended by medical personnel.  *See* Chana Braun Decl. ¶¶ 20–30. For periods of pain and suffering of a less than a minute to a few hours after an attack but prior to death, courts have awarded damages of $1,000,000.  *See, e.g., Stern v. Islamic Republic of Iran*, 271 F. Supp. 2d 286, 300 (D.D.C. 2003) (citing authorities awarding $1,000,000 for pain and suffering lasting between thirty seconds and several hours); *cf. Thuneibat v. Syrian Arab Republic*, 167 F. Supp. 3d 22, 39 n.4 (D.D.C. 2016) (Howell, J.) (declining to award survival damages where the plaintiffs "submitted no evidence . . . showing that either of the [v]ictims suffered any pain and suffering prior to their deaths in the suicide bombings, but instead, given [their] proximity to the suicide bombers, their deaths were more likely instantaneous"); *Mwila v. Islamic Republic of Iran*, 33 F. Supp. 3d 36, 42–43 (D.D.C. 2014) (declining to award survival damages where "[n]o one testified that any of the deceased victims survived the blast itself for any period of time, and the evidence indicates that they likely did not").  Accordingly, Chaya

Zissel Braun's estate is entitled to $1,000,000 in survival damages for her pain and suffering after the Attack and prior to her death.

The defendants are also liable to Chana and Shmuel Braun as survivors of the Attack for battery, assault, and intentional infliction of emotional distress, but in view of the bar on multiple recoveries, the plaintiffs may only recover damages reflecting the single harm underlying these three torts. The plaintiffs contend they experienced "severe psychological injuries, extreme pain and suffering," Compl. ¶ 74, "mental anguish," *id.* ¶ 81, "egregious emotional distress," *id.* ¶ 86, and in the case of Shmuel, "actual physical injury," *id.* ¶ 81, as a result of the Attack. "[W]hen assessing damages for surviving victims of terrorist hostilities," the "baseline assumption" is that "'persons suffering injuries in terrorist attacks are entitled to $5 million in damages.'" *Kaplan*, 2016 WL 5714754, at *3 (quoting *Davis v. Islamic Republic of Iran*, 882 F. Supp. 2d 7, 12 (D.D.C. 2012)). This baseline may be moderated either upward or downward; an upward departure would be warranted "in the presence of 'severe instances of physical and psychological pain, such as where victims suffered relatively more numerous and severe injuries, were rendered quadriplegic, including partially lost vision and hearing, or were mistaken for dead,' or downward in the face of 'minor shrapnel injuries or minor injury from small-arms fire.'" *Id.* (citation omitted) (quoting *Valore*, 700 F. Supp. 2d at 84). In the case of "victims who 'suffered severe emotional injury without physical injury, this Court has typically awarded the victim $1.5 million.'" *Id.* (quoting *Harrison v. Republic of Sudan*, 882 F. Supp. 2d 23, 49 (D.D.C. 2012)).

In this case, Shmuel Braun suffered physical and psychological injuries that have caused him great pain. Nevertheless, his physical injuries are relatively minor compared to the "compound fractures, serious flesh wounds, and scars from shrapnel" that generally justify the baseline award of $5,000,000 and more akin to minor injuries from shrapnel or small-arms fire

that warrant a downward departure.  *Khaliq v. Republic of Sudan*, 33 F. Supp. 3d 29, 33 (D.D.C.

2014).  Accordingly, Shmuel Braun is entitled to an award of $2,500,000 for his own pain and

suffering as a survivor of the Attack.

Chana Braun suffered psychological injuries but no physical injuries and, consequently,

might presumptively be entitled to an award of only $1,500,000.  *See, e.g., Kaplan*, 2016 WL

5714754, at *3.  Yet, unlike Shmuel, who experienced much of what occurred after he was

physically injured as a "blur," Shmuel Braun Decl. ¶ 8, Chana endured, as part of the Attack, the

horror of witnessing her only child being thrown from her care into the air, running to pick the

child up only to find the child visibly and severely injured, trying to obtain medical assistance

while simultaneously fearing gunfire she believed to be targeted at her and her child, and staying

with her daughter while medical professionals attempted, ultimately without avail, to save her

daughter's life, *see* Chana Braun Decl. ¶¶ 11–27.  Accordingly, Chana Braun is entitled to an

award of $2,500,000 for her pain and suffering as a survivor of the Attack.  *See, e.g., Acosta*, 574

F. Supp. 2d at 30 (awarding enhancement in view of the plaintiff's "own pain and suffering

endured by being present during the shooting" that wounded her husband).

### 4.  Solatium

Chana and Shmuel Braun, Esther and Murray Braun, and Sara and Shimshon Halperin

seek solatium damages to compensate for the emotional distress they experienced as family

members of victims of the Attack.  Compl. ¶ 86.  "A claim for solatium seeks compensation for

the 'mental anguish, bereavement and grief that those with a close personal relationship to a

decedent experience as a result of the decedent's death, as well as the harm caused by the loss of

the decedent, society and comfort.'"  *Baker v. Socialist People's Libyan Arab Jamahirya*, 775 F.

Supp. 2d 48, 83 (D.D.C. 2011) (quoting *Belkin*, 667 F. Supp. 2d at 22).  In determining the

27

appropriate amount to compensate for victims' family members' emotional distress, "the Court

may look to prior decisions awarding damages . . . for solatium." *Acosta*, 574 F. Supp. 2d at 29.

Solatium damages, by their nature, are "unquantifiable," *Moradi*, 77 F. Supp. 3d at 72, and,

therefore, this Court has developed a commonly accepted standardized framework, known as the

*Heiser* damages framework, for solatium damages.  *Estate of Heiser*, 466 F. Supp. 2d at 269; *see*

*Roth*, 78 F. Supp. 3d at 403 (noting the "framework has been adopted by other courts as an

appropriate measure of solatium damages for the family members of victims of state-sponsored

terror (citing *Valore*, 700 F. Supp. 2d at 85)).  As a baseline, the framework awards

"approximately $5 million to a parent whose child was killed" in a terrorist attack.  *Estate of*

*Heiser*, 466 F. Supp. 2d at 269.  "[F]amilies of victims who have died are typically awarded

greater damages than families of victims who remain alive."  *Id.* (quoting *Haim*, 425 F. Supp. 2d

at 75).  Accordingly, "in the context of distress resulting from injury to loved ones—rather than

death—courts have applied a framework where 'awards are valued at half of the awards to

family members of the deceased,'" *i.e.*, $2,500,000 to parents of surviving victims.  *Wultz v.*

*Islamic Republic of Iran*, 864 F. Supp. 2d 24, 41 (D.D.C. 2012) (citing authorities).

　　These numbers serve only as a baseline from which the Court may deviate in order to

compensate for specific circumstances.  Factors militating in favor of an award enhancement

generally fall into one of three categories: "evidence establishing an especially close relationship

between the plaintiff and decedent, particularly in comparison to the normal interactions to be

expected given the familial relationship; medical proof of severe pain, grief or suffering on

behalf of the claimant; and circumstances surrounding the terrorist attack which made the

suffering particularly more acute or agonizing." *Oveissi*, 768 F. Supp. 2d at 26–27.  "Decisions

to deviate from the starting points provided by the *Heiser* framework are committed to the discretion of the particular court in each case . . . ." *Id.* at 26.

### a. Chana and Shmuel Braun

Without a doubt, Chana and Shmuel Braun are entitled to at least the baseline award of $5,000,000 for their solatium damages from the death of their child.  The question remaining is whether, in view of their particular circumstances, they are entitled to an enhancement of that baseline amount.

Although Chana and Shmuel Braun experienced some difficulty in conceiving Chaya Zissel Braun, such difficulty does not warrant a finding that their relationship with their daughter differed from "the normal interactions to be expected given the familial relationship." *Id.* at 26–27.  On the other hand, with respect to the severity of these plaintiffs' grief, the evidence reflects that an enhancement is appropriate.  According to a psychiatrist who examined Chana, she "displays some form of Persistent Complex Bereavement Disorder, Post-traumatic Stress Disorder and Persistent Depressive Disorder either currently or in the past as a result of her daughter being killed in a terror attack in 2014" and "many of her symptoms with which she has been diagnosed are likely to be present in varying degrees for a significant time to come and while it is impossible to state for any absolute certainty, many of the symptoms may even be permanent."  Strous Expert Decl. Re: Chana Braun ¶¶ 16–17.  The same psychiatrist gave Shmuel a similar diagnosis and prognosis, although Shmuel, by contrast, "displays some form of Persistent Complex Bereavement Disorder, Post-traumatic Stress Disorder and Anxiety Disorder."  Strous Expert Decl. Re: Shmuel Braun ¶¶ 16–17.  While serious, however, these conditions are less severe than those found to warrant a significant damages enhancement on their own.  *Cf. Estate of Brown v. Islamic Republic of Iran*, 872 F. Supp. 2d 37, 43 (D.D.C.

2012) (awarding enhanced damages of $3,000,000 to the sister of the deceased victim where she "suffered a nervous breakdown . . . for which she sought medical treatment and was prescribed medication for approximately one year" (internal quotation marks omitted)); *Baker*, 775 F. Supp. 2d at 83 (awarding an upward departure of 25% where the sister of the deceased victim "had to be hospitalized for asthma and shock . . . and has battled depression ever since"). Yet, Chana and Shmuel's presence at the scene of the Attack constitutes an especially egregious circumstance warranting an upward departure. The two parents suffer the heightened anguish of not only losing a three-month old child, but having first-hand observations and acute memories of the child's death. In view of these two considerations, Chana and Shmuel Braun are entitled to an enhancement of 25%, for a total of $6,250,000 for each of these two plaintiffs. *See Thuneibat*, 167 F. Supp. 3d at 52 ("[The plaintiff's] presence at the scene of the attack and the extremity of her mental distress . . . warrant an upward departure of . . . 25%.").

### b.      Esther and Murray Braun; Sara and Shimshon Halperin

Esther and Murray Braun and Sara and Shimshon Halperin have each suffered greatly from seeing the effects of the Attack and the resulting death of their granddaughter on their respective children. *See* Strous Expert Decl. Re: Esther Braun ¶¶ 16–17 (explaining that Esther Braun displays symptoms of persistent psychological disorders related to grief and "that many of her symptoms . . . are likely to be present in varying degrees for a significant time to come and . . . may even be permanent"); Strous Expert Decl. Re: Murray Braun ¶¶ 16–17 (same); Strous Expert Decl. Re: Sara Halperin ¶¶ 15–16 (same); Strous Expert Decl. Re: Sara Halperin ¶¶ 15–16 (same). Yet, Chana and Shmuel, fortunately, remain alive. Accordingly, each of these four plaintiffs is entitled to an award of $2,500,000. *See, e.g., Wultz*, 864 F. Supp. 2d at 41.

### 5. *Punitive Damages*

The plaintiffs also seek punitive damages, which are awarded not to compensate the victims, but to "punish outrageous behavior and deter such outrageous conduct in the future." *Kim*, 87 F. Supp. 3d at 290 (quoting *Bodoff v. Islamic Republic of Iran*, 907 F. Supp. 2d 93, 105 (D.D.C. 2012) (internal quotation marks omitted)); *see also* RESTATEMENT (SECOND) OF TORTS § 908(1) (1977). Punitive damages are warranted where "defendants supported, protected, harbored, aided, abetted, enabled, sponsored, conspired with, and subsidized a known terrorist organization whose modus operandi included the targeting, brutalization, and murder of American citizens and others." *Baker*, 775 F. Supp. 2d at 85. The defendants' conduct in supporting Hamas justifies the imposition of punitive damages here.

In determining the appropriate amount of punitive damages, courts consider "(1) the character of the defendants' act, (2) the nature and extent of harm to the plaintiffs that the defendants caused or intended to cause, (3) the need for deterrence, and (4) the wealth of the defendants." *Wultz*, 864 F. Supp. 2d at 41 (quoting *Acosta*, 574 F. Supp. 2d at 30). Taking into account these factors, several approaches have been articulated for calculation of the appropriate amount of punitive damages in state-sponsored terrorism cases involving Iran, Syria, and other similar defendants. One approach is to multiply the foreign state's "annual expenditures on terrorism" by a factor between three and five. *See Baker*, 775 F. Supp. 2d at 85 (citing *Valore*, 700 F. Supp. 2d at 88–90; *Estate of Heiser*, 659 F. Supp. 2d at 30–31; *Acosta*, 574 F. Supp. 2d at 31); *Beer v. Islamic Republic of Iran*, 789 F. Supp. 2d 14, 26 (D.D.C. 2011). This approach, which may result in awards in the billions of dollars, has been used in the case of exceptionally deadly attacks, such as the 1983 bombing of the Marine barracks in Beirut, which killed 241 American military servicemen. *See Baker*, 775 F. Supp. 2d at 85. Another approach awards a

fixed amount of $150,000,000 per affected family.  *See Wyatt*, 908 F. Supp. 2d at 233 (awarding

$300,000,000 in total to two victims and their families); *Baker*, 775 F. Supp. 2d at 86 (awarding

$150,000,000 each to families of three deceased victims); *Gates*, 580 F. Supp. 2d at 75

(awarding $150,000,000 each to the estates of two victims).

The defendants' conduct in providing material support to the terrorist group that

perpetrated the attacks here is indeed outrageous, and the results are indisputably tragic.  The

conduct here, however, is more akin to the conduct in cases awarding $150,000,000 per family

than the cases in which a multiple of a foreign state's entire sponsorship of terrorism is used.  In

*Gates*, for example, where $150,000,000 in punitive damages per family was awarded, two

American civilians working in Iraq were brutally decapitated and their deaths videotaped to be

broadcast to the world, 580 F. Supp. 2d at 55, and in *Baker*, terrorists, who hijacked a Cairo-

bound plane, shot "execution-style" three Americans on board the flight, 775 F. Supp. 2d at 55.

Mindful of these precedents, this Court will award $150,000,000 in punitive damages against the

defendants in this case.

## IV.    CONCLUSION

For the reasons outlined above, the plaintiffs' motion for default judgment is granted.

The defendants are jointly and severally liable for the death of Chaya Zissel Braun and the

injuries to the family member plaintiffs.  The plaintiffs are awarded monetary damages in the

following amounts: the plaintiffs are entitled to $150,000,000 in punitive damages; Chaya Zissel

Braun's estate is entitled to $1,000,000 in survival damages; Chaya Zissel's parents, Chana and

Shmuel Braun, are each entitled to $2,500,000 in pain and suffering and $6,250,000 in solatium

damages; Esther Braun is entitled to $2,500,000 in solatium damages; Murray Braun is entitled

to $2,500,000 in solatium damages; Sara Halperin is entitled to $2,500,000 in solatium damages;

and Shimshon Halperin is entitled to $2,500,000 in solatium damages.  Thus, the total damages

award is $178,500,000.

An appropriate order accompanies this Memorandum Opinion.

Date: January 9, 2017

_____
BERYL A. HOWELL
Chief Judge